Grant M. PRISBREY, Trustee in Bankruptcy of the Estate of DeWayne Iverson, Plaintiff-Appellee,

and

Zions First National Bank, N.A., Intervening Plaintiff-Appellant,

v.

V. Glen NOBLE, Defendant-Appellee and Cross-Appellant,

and

St. Paul Fire and Marine Insurance Company, Substitute Defendant-Appellee and Cross-Appellant.

Nos. 74-1002, 74-1003.

United States Court of Appeals, Tenth Circuit.

Argued Aug. 19, 1974.

Decided Nov. 5, 1974.

---

Richard H. Nebeker, Salt Lake City, Utah, for intervening plaintiff-appellant.

Herschel J. Saperstein, Salt Lake City, Utah, for defendant-appellee Prisbrey.

H. Wayne Wadsworth, Salt Lake City, Utah, for substitute defendant-appellee St. Paul Fire & Marine Ins. Co.

Before HILL and DOYLE, Circuit Judges, and SMITH,* District Judge.

HILL, Circuit Judge.

## FACTS

In this action, the appellee trustee in bankruptcy seeks to recover 35,000 shares of stock (or the stock's fair value as of June 24, 1971) for the bankrupt estate. The intervening plaintiff-appellant, Zions First National Bank, N.A. (Zions), desires the court to declare a first and paramount lien upon the stock for the bank's behalf to secure a claim against the bankrupt in the sum of $17,316.25 plus interest.

DeWayne Iverson, the bankrupt involved in this case, was president of Iverson Construction Company and was married to Sharolyn Iverson, the daughter of V. Glen Noble. On January 11, 1966, Iverson Construction Company, the Iversons, Noble (then secretary of the construction company) and his wife, and Clifton and Rhoda Clark (Mrs. Iverson's grandparents) signed a general agreement of indemnity. In this agreement, the indemnitors covenanted, *inter alia*, to save St. Paul Fire & Marine Insurance Company (substitute defendant-cross appellant) harmless from and against every claim, demand, liability, loss, etc., sustained because of the company's execution of bonds on behalf of Iverson Construction Company.

The construction company sustained a loss of $132,905 for its 1970 fiscal year (October 1, 1969 to September 30, 1970). The accountant handling the company's books testified the company probably had no net worth as of September 30, 1970. Iverson was informed of the loss in December, 1970. Early in 1971, Iverson discussed the construction company's plight with bonding companies who had executed construction and performance bonds for the construction company's projects. Iverson notified Noble that the bonding companies were saying that Noble was an indemnifier of all the jobs; Iverson periodically apprised Noble of the construction company's fiscal status and advised Noble the company was not solvent. On June 10, 1971, a meeting was held to discuss how the construction company's projects would be completed. Three bonding companies' representatives, their respective attorneys, Iverson, Noble, and Noble's attorney were present. After the meeting, Noble told Iverson that if he were required to make payments because of the indemnity agreements it would bankrupt him. Noble's attorney told Noble not to worry, that the latter had not signed a perpetuity bond.

By an instrument dated June 14, 1971, Iverson assigned Noble all right, title and interest Iverson owned in certain shares of Valtek Incorporated stock. On June 15, 1971, Iverson went to Zions and said that he needed to take a certificate representing 35,000 Valtek shares to a transfer company to remove a restrictive legend on the stock and that he would return the stock later that afternoon or on the following morning. Iverson signed a receipt agreeing to replace the stock with 35,000 shares of Valtek by June 16, 1971. Iverson had had various loans at the bank and had delivered possession of this stock certificate on April 27, 1971, as security when he signed a $15,000 renewal note. Iverson took the single certificate to Intermountain Transfer Company and had the stock

---

* Honorable Talbot Smith, of the Eastern District of Michigan, sitting by designation.

broken into three certificates, two of 15,000 shares each and one of 5,000 shares. Shortly after June 17, 1971, the stock certificates were endorsed in blank and delivered to Noble. According to the pre-trial order, Iverson's only possible indebtedness to Noble at the time of the execution of the assignment and delivery of the shares was under the 1965 indemnity agreement; the assignment and delivery was for the purpose of securing or indemnifying Noble against any loss which he might sustain because of his signing the indemnity agreement. Nothing was given Iverson by Noble for the shares.

An involuntary bankruptcy petition was filed against Iverson by the three bonding companies on September 22, 1971. A petition for bankruptcy was filed by Iverson Construction Company on December 3, 1971. On November 30, 1971, St. Paul filed suit against the indemnitors in the District Court for the Third Judicial District in and for the County of Salt Lake, State of Utah, seeking recovery under the indemnity agreement of claims and obligations aggregating in excess of $250,000. Noble filed an answer denying liability. The instant case was filed against Noble by the trustee in bankruptcy of the estate of DeWayne Iverson on August 21, 1971. On November 1, 1972, the trial court granted Zions' motion to intervene as a plaintiff. Following Noble's assignment on January 16, 1973, to St. Paul Insurance Companies of all right, title and interest he possessed in the 35,000 shares of Valtek stock, St. Paul became the substitute defendant.

This case was tried to the court on March 16, 1973. The trial court made numerous findings including the following. (1) The bankrupt received fair consideration for the stock within the meaning of 11 U.S.C. § 107(d)(1); thus, the transfer was not fraudulent and voidable under 11 U.S.C. § 107(d)(2)(a). (2) The transfer was made with an actual intent to hinder, delay or defraud either existing or future creditors (Iverson obtained the stock under false pretenses from the bank which was a creditor holding a valid lien on the stock) and Noble was not a bona fide purchaser under 11 U.S.C. § 107(d)(6) because his antecedent debt was not present fair equivalent value; consequently, the transfer was fraudulent under 11 U.S.C. § 107(d)(2)(d) and voidable under 11 U.S.C. § 107(d)(6). (3) The contingent debt was determined to be provable in bankruptcy and the transfer was voidable as a preference under 11 U.S.C. § 96(a)(1) and (b). (4) Noble was a bona fide purchaser of the shares (Utah Code Ann. § 70A–8–302) as he took the shares endorsed in blank, for value, in good faith and without notice of the fraud. The intervenor therefore had no claim precedent to the trustee. Thus the court declared the transfer to be null and void as against the trustee in bankruptcy but valid as against Zions. "The lien or security title of and said transfer" were ordered preserved for the bankrupt estate's benefit.

## THE 11 U.S.C. § 107(d)(2)(d) CLAIM

Appellant St. Paul argues there is no evidence that Iverson intended to hinder, delay or defraud his creditors by making the stock transfer to Noble; this intent is an essential element of a fraudulent transfer under § 107(d)(2)(d). The trial court, however, specifically held that Iverson obtained the shares under false pretenses from the bank and that this conduct constituted an actual intent to defraud the creditor bank. The finding of a fraudulent intent is a factual determination. Nicklaus v. Peoples Bank & Trust Co., 369 F.2d 683 (8th Cir. 1966). This factual determination of the trial court can only be reversed if it is clearly erroneous. Schafer v. Hammond, 456 F.2d 15 (10th Cir. 1972). *See* 4 Collier on Bankruptcy, ¶ 67.37, n. 47 at 544 (14th ed. 1971).

Many courts have recognized that a finding of the requisite intent for a fraudulent transfer under § 107(d)(2)(d) may be dependent on facts which lead

to the irresistible conclusion that the transferor's conduct was motivated by such intent; direct proof of the fraudulent intent is not required. 4 Collier on Bankruptcy, *supra,* ¶ 67.37[3] at 536–37. There is evidence that an assignment to Noble of the Valtek shares was executed by Iverson on June 14, 1971; Iverson obtained the shares from Zions on June 15, 1971; Iverson signed a receipt agreeing to return the shares to Zions; Iverson subsequently delivered the shares to Noble. Here the transfer occurred between family members, son-in-law and father-in-law. Courts give close scrutiny to intrafamily transactions and " . . . the relationship of the parties in conjunction with other circumstances often makes a trustee's case compelling notwithstanding the absence of direct evidence of fraud." 4 Collier on Bankruptcy, *supra,* at 542. The trial court also found an intent to prefer one creditor (Noble) over others. The intent to prefer alone does not make a transfer fraudulent under § 107(d)(2) (d) but is an important consideration in determining if an intent to defraud existed. Van Iderstine v. National Discount Co., 227 U.S. 575, 33 S.Ct. 343, 57 L.Ed. 652 (1913).

 St. Paul contends the transferee's good faith prevents a determination of actual intent to defaud. The question of the good faith of the transferee Noble, however, is more appropriate to issues under § 107(d)(6) dealing with the trustee's preservation of the transfer. St. Paul did not analyze the transfer under these provisions. Concerning § 107(d)(6) the bank argues (1) a transfer is only preserved under this provision if a bona fide purchaser has given less than full consideration or an equity is still available for general creditors, (2) the transfer is preserved for the bona fide purchaser and the remaining equity goes to the bankrupt's estate, and (3) here the transferee was not a bona fide purchaser and the statute does not authorize the lien's preservation. This provision, however, does not require a bona fide purchaser before its preservation effect is applicable; on

the contrary, if a bona fide purchaser has given present fair equivalent value, the preservation of the transfer for the bankrupt estate's benefit is not allowed. The trial court determined no *present* fair value had been given by Noble because only an antecedent debt was involved here. 4 Collier on Bankruptcy, *supra,* ¶ 67.41 at 592–93. Consequently, the savings clause was not applicable to this transfer and the court properly could order the transfer preserved for the benefit of the estate with the trustee succeeding to Noble's rights.

### THE 11 U.S.C. § 96 CLAIM

 The trustee claims that the transfer was also a voidable preference under § 96(a)(1) and (b) of the Bankruptcy Act. St. Paul primarily attacks the trial court's determination that a voidable preference had occurred by arguing the evidence does not show Noble had reasonable cause to believe Iverson was insolvent, which is an essential element of a voidable preference.

 St. Paul, in particular, argues knowledge of the corporation's insolvency would not give Noble reasonable cause to believe Iverson was personally insolvent. Admittedly, the trustee must show more than a mere suspicion of insolvency. Grant v. First Nat'l Bank, 97 U.S. 80, 24 L.Ed. 971 (1878). However, the trustee need not prove the transferee knew of the debtor's insolvency. Rather, the trustee will have proven this element of a voidable preference if he shows that a creditor has " . . . knowledge or notice of facts and circumstances which would incite a person of reasonable prudence under similar circumstances to make an inquiry and, if such an inquiry would lead to the development of facts essential to the knowledge of the situation . . . ." Carroll v. Holliman, 336 F.2d 425, 428 (10th Cir. 1964), cert. den'd, 380 U.S. 907, 85 S.Ct. 889, 13 L.Ed.2d 795 (1965). In *Carroll,* the court recognized that kinship between a creditor and president of a debtor corporation did not compel a finding of the existence of a reasonable cause

to believe debtor was insolvent. In this case, Noble was not only the father-in-law of the debtor but also was an indemnitor who had been informed of the insolvency of his son-in-law's major business activity. Iverson had told Noble the only item of value he really had was the Valtek stock. Although only one of seven indemnitors of the surety, Noble had expressed concern that he would be bankrupt if held liable on the agreement; this indicates some understanding of Iverson's total precarious financial position.

St. Paul also alleges that the record is devoid of any evidence indicating Iverson was personally insolvent at the time of the transfer. The schedules in bankruptcy and the testimony of the accountant relating back these schedules to the date in question were available to the trial court. St. Paul makes no specific challenge to this methodology's use. 1 Collier on Bankruptcy, *supra*, ¶ 1.19 at 130.7–.8.

## THE BANK VERSUS THE TRUSTEE

The trial court determined the transfer of the stock was null and void as against the trustee and ordered the transfer preserved for the bankrupt estate. 11 U.S.C. §§ 96(b), 107(d)(6). Zions asserts it has a precedent claim and seeks to apply the stock directly to Iverson's debt it is holding rather than await a pro rata return from the trustee. The trustee, of course, does not rely on rights which Iverson had in the stock but, by virtue of the preservation provisions aforementioned, alleges he has succeeded to Noble's rights. 9 Am. Jur.2d Bankruptcy § 1126 (1963). The trial court held Noble was a bona fide purchaser of the stock under Utah Code Ann. § 70A–8–302 and this status gave the trustee rights superior to Zions.

Under § 70A–8–302, a person is a bona fide purchaser if he is "a purchaser for value in good faith and without notice of any adverse claim who takes delivery of a security in bearer form or of one in registered form issued to him or indorsed to him in blank."

Zions attacks the bona fide purchaser determination by alleging no value was given by Noble to Iverson. *Value* is defined in Utah Code Ann. § 70A–1–201(44) which provides in pertinent part:

> . . . a person gives 'value' for rights if he acquires them
>
> . . . . . .
>
> (b) as security for or in total or partial satisfaction of a pre-existing claim . . .

The pre-trial order indicates consideration, if any, must be found in the earlier execution of the indemnity agreement. Under this agreement Noble and Iverson were co-indemnitors with joint and several liability; if either party discharged more than his proportionate share of the obligation, that party would have a right to contribution from the other. 18 C.J.S. Contribution § 6 (1939). The trial court apparently held this right to contribution, although contingent, was a pre-existing claim which the stock secured. The bank argues no claim was in existence and consequently no value was given. The bank cites 18 C.J.S. Contribution § 4 which states:

> The right to contribution is inchoate from the date of the creation of the relation between the parties, but is not complete, so as to be enforceable, until there has been an actual payment, in whole or in part, of the common obligation or until something is done equivalent to a discharge thereof.

The right to contribution arises when the relationship is entered and is enforceable only upon payment by one co-obligor of more than his share. McCallister v. Jones, 208 Or. 365, 300 P.2d 973 (1956). Noble's right to contribution from Iverson came into existence upon execution of the indemnity agreement, but that claim could not be enforced until Noble paid more than his proportionate share of the obligation. This appears to be a contingent claim, an obligation which it remains uncertain if a party will ever become liable to pay. 14 C.J.S. Claim p. 1185 (1939).

No Utah case determining if a contingent debt is a pre-existing claim for purposes of Utah Code Ann. § 70A–1–201(44) has been cited to us. Pre-code law apparently found consideration when a pledge was made to secure a pledgor's contingent liability. Annot., 43 A.L.R. 1069 (1926). *See* 68 Am.Jur. 2d Secured Transactions § 70 (1973). No intention to change these cases' results has been indicated.

■ Noble was a bona fide purchaser; he acquired the stock free of any adverse claim. Utah Code Ann. § 70A–8–301(2). " 'Adverse claim' includes a claim that a transfer was or would be wrongful or that a particular adverse person is the owner of or has an interest in the security." § 70A–8–301(1). The trustee by virtue of the preservation order succeeds to Noble's status. Clearly, any claim by Zions that the transfer was wrongful would be insufficient to overcome the bona fide purchaser status.

■ As a last defense, Zions contends the general principles of equity require reinstatement of its lien against the stock and preclude the bankrupt estate's enrichment by the bankrupt's fraud at Zions' expense. The cases relied on by Zions do not involve the preservation of a transfer and the priority rights of a trustee as successor to a third party bona fide purchaser. Without the intervention of the trustee in bankruptcy, Noble's assignee would retain the property. Equitable considerations do not allow a court to set aside the applicable bankruptcy law and to order preferential payments. In re American Fuel & Power Co., 151 F.2d 470 (6th Cir. 1945). The preservation provisions of 11 U.S.C. §§ 96(b) and 107(d)(6) allow preservation for the benefit of the estate and not specific creditors.

## CONCLUSION

The trial court's determination of an intent on Iverson's part to hinder, delay or defraud his creditors by transferring the shares was not clearly erroneous.

Noble did not give present fair equivalent value for the transfer and could not qualify as a bona fide purchaser giving such value under 11 U.S.C. § 107(d)(6). Thus, the transfer may be preserved for the benefit of the estate with the trustee succeeding to Noble's rights.

The trial court correctly determined that Noble had reasonable cause to believe Iverson was insolvent and consequently a voidable preference had occurred. 11 U.S.C. § 96(a)(1) and (b). The lien or security title was properly preserved for the benefit of the estate.

Based on Utah Code Ann. § 70A–1–201(44), value was given for the transfer of stock when Noble accepted the stock as security for a pre-existing claim —Iverson's contingent liability to contribute if Noble paid more than his proportionate share of the obligation under the indemnity agreement. Noble was a bona fide purchaser under Utah Code Ann. § 70A–8–302 and the trustee succeeded to Noble's rights for the benefit of the estate. The bank has no claim to the stock precedent to that of the trustee.

Affirmed.