INSURANCE COMPANY OF NORTH AMERICA, Plaintiff,

v.

UNITED STATES of America, and Norman Carroll and William Carroll, Administrators of the Estate of Morris Carroll, Deceased, and Pershing & Co., Inc., Defendants.

Civ. A. No. 77–2621.

United States District Court, E.D. Pennsylvania.

March 4, 1983.

Bernard Chanin, Steven B. King, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for plaintiff.

Malcolm H. Waldron, Jr., Robert Silverman, Philadelphia, Pa., for defendants Norman and William Carroll.

Paul J. Donnelly, Herbert G. Keene, Stradley, Ronon, Stevens & Young, Philadelphia, Pa., for defendants Pershing & Co., Inc. and U.S.A.

William McGettigan, Asst. U.S. Atty., Philadelphia, Pa., for U.S.A.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHAPIRO, District Judge.

Plaintiff, Insurance Company of North America, (INA), as assignee and subrogee of Cannon & Company, Inc. (CANNON), brings this action against the United States, Norman Carroll and William Carroll, Administrators of the Estate of Morris Carroll, deceased (CARROLL) and Pershing & Co., Inc. (PERSHING). Plaintiff sues the United States of America under the Tucker Act, 28 U.S.C. § 1346(a)(2) as a contract action and alternatively under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671, et seq. Claims against Carroll, from whom Cannon purchased the bonds, are based on §§ 27 and 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78aa, 78j(b) and Rule 10(b)(5) of the Securities and Exchange Commission thereunder; plaintiff has also brought pendent state claims of common law fraud and deceit, and further asks this court to issue a declaratory judgment of the rights of INA and Carroll in a proceeding pending in state court. Claims against Pershing are brought pursuant to this court's diversity jurisdiction based on wrongful transfer of the bonds under

U.C.C. § 8–315 [1] and the common law tort of conversion.

## I. Findings of Fact

1. Plaintiff, INA is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business at 1600 Arch Street, Philadelphia, Pennsylvania. Defendant Pershing is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 120 Broadway, New York, New York. Pershing is engaged in the securities brokerage business and is a regular member organization of, and transacts business on and through, the Philadelphia-Baltimore-Washington Stock Exchange (PBW) in Philadelphia, Pennsylvania, as well as the New York, American and other stock exchanges.

2. At the time of the transactions in suit, Cannon, INA's insured, was a securities broker-dealer with offices in Flourtown, Pennsylvania. Cannon was a member of the PBW and of the National Association of Securities Dealers (NASD) but not of the New York or American Stock Exchanges.

3. Defendants Norman and William Carroll are administrators of the Estate of Morris Carroll, deceased. Between April and August 1971, Morris Carroll delivered to Cannon bonds with a face value of $172,000.00 for Cannon to sell on his behalf. All but $27,000.00 of those bonds had been stolen from Pershing.

4. On various dates between August 1971 and March 1972 Cannon delivered these bonds to the FBI for investigation of their theft. On November 8, 1974, the FBI delivered the bonds to Pershing rather than to Cannon.

5. INA was Cannon's insurer and reimbursed Cannon for its loss under the terms of its policy. At the time INA indemnified Cannon the latter assigned to INA all of its interest in the bonds and in receipts signed by the FBI when it took possession of the bonds. Cannon so advised the FBI.

6. INA, as the subrogee of Cannon, brought this suit against Pershing to recover the value of the bonds and against the personal representatives of Morris Carroll to recover the $91,610.33 paid to Carroll in connection with the sale of some of the bonds and against the United States for breach of contract as bailee of the bonds, for negligence and conversion of the bonds. INA claims interest and costs of suit in damages.

7. Dominick Paciolla was a Cannon account executive; he had been in the securities business since 1968 and employed by Cannon since 1970.

8. Paciolla met Samuel Cartier (CARTIER) in early 1971. Cartier held himself out as a financial consultant who specialized in corporate financing, mergers, and acquisitions. Cartier gave Paciolla his business card stating an address of his financial consulting office in the Land Title Building, Broad and Chestnut Streets, Philadelphia, Pennsylvania, and a business telephone number.

9. Paciolla had several conversations with Cartier during the two or three months preceding April 1971.

10. Paciolla asked Cartier to use his services as a securities salesman.

11. Cartier inquired if Paciolla would handle sales for an individual for whom he was the financial consultant and who owned bearer bonds he desired to sell. This individual was Morris Carroll.

12. Cartier delivered $44,000.00 of Gulf & Western bearer bonds to Paciolla on April 19, 1971 at a prearranged meeting place on a street corner in Philadelphia.

---

1. On November 1, 1979, the Uniform Commercial Code, 12A P.S. § 1–101, *et seq.* was repealed and reenacted at 13 Pa.C.S.A. § 1101, *et seq.*, P.L. 255, No. 86, effective January 1, 1980. Section 7 of that Act provides that the legislative intent was to effect a transfer of the former provisions without effecting a change in the substantive law. Because the instant cause arose of action under the former UCC provisions, all references will be to the provisions as found in Title 12A.

13. At this time Cartier provided Cannon with Carroll's name, an address, telephone number, and social security number, and advised that Carroll was retired, and had a net worth approximating $100,000.00 and Cartier gave the First Pennsylvania Bank as a bank reference. The next day, April 20, 1971, Paciolla entered the information provided on the New Account form employed by Cannon.

14. John C. Williams, President of Cannon, a 25-year veteran of the securities industry, reviewed the form, satisfied himself that all information required was present, and countersigned the card on April 21, 1971. In the course of his normal duties, Williams reviewed all daily trades and all customer monthly statements including the Carroll trades and statements and found nothing suspicious about the Morris Carroll account.

15. It was normal Cannon practice for Mr. Williams' secretary to telephone bank references given by a customer to see if the bank would confirm the account and to check the address provided. However, in 1971 it was the practice of First Pennsylvania not to reveal such information. The secretary would report only contradictory information to Williams. She would not report a refusal to give information on an account and did not make any report on the Carroll account. She did not report any problem with the address, although it was later found to be incorrect. Williams had no recollection whether Cannon ran a credit check on Carroll, as was the periodic practice with regard to every fifth or sixth account of "size".

16. On April 20, 1971, Paciolla presented the first group of Gulf & Western bonds for sale. Each of the bonds received was payable to order of bearer, was complete and regular on its face and contained no overdue interest coupons. None of the bonds was indorsed "for collection", "for surrender", or any other purpose not involving transfer. Nor did any of the bonds contain any statement or legend reflecting that they were the property of anyone other than Carroll.

17. Prior to executing the sale, Paciolla, together with Harry Byerly, Vice-President and Cashier at Cannon, examined accumulated lists of lost/stolen securities which Cannon had. Byerly and Paciolla compared serial numbers of the bonds presented for sale against serial numbers designated on the lists of lost and stolen securities. None of the bond serial numbers were listed on any of the lost security flyers in Cannon's possession on April 20, 1971.

18. Cannon sold the bonds for Carroll's account at the market price on April 20, 1971. On the following day, Cartier requested payment of the proceeds to Carroll (a "prepayment"). Settlement is ordinarily in five business days. Prepayments were requested by Cannon customers only three or four times per month although there were 7,000 to 8,000 trades per year. So long as an appropriate reason for a request was made and the bonds had been delivered, cash settlement was permitted after deduction of an appropriate interest charge. No one could recall the reason given for this request.

19. Approximately three weeks later, Cartier called Paciolla and advised that Carroll desired to sell more of the same Gulf & Western bond issue.

20. On May 12, 1971 Paciolla again met Cartier outside the office and received $25,000.00 of Gulf & Western bonds, for which he wrote "Received 25 Gulf & Western 5¼ 1987" on the back of his business card which he gave to Cartier. Each of these bonds was also complete and regular on its face, payable to the order of the bearer, with no overdue interest coupons. None of the bonds was indorsed "for collection", "for surrender" or for any other purpose not involving transfer. Nor did any bond contain any statement or legend reflecting that it was the property of anyone other than Carroll. These bonds were sold on May 13, 1971, after Harry Byerly, Operations Manager at Cannon, checked them against the lost/stolen lists maintained by Cannon.

21. Paciolla received additional Gulf & Western bonds from Cartier which were sold on May 14, 1971 ($18,000.00) and May

17, 1971 ($6,000.00). No one at Cannon checked these bonds against the lost/stolen lists prior to their sale.

22. The net proceeds of sale were paid to Carroll for the second, third, and fourth trades.

23. The Gulf & Western bonds sold in these trades were delivered after the trade date but before the settlement date.

24. The Gulf & Western bonds delivered to Paciolla on April 19 were in Cannon's office on April 20, 1971, at the time of the initial trade.

25. On May 27, 1971, Cannon sold $20,000.00 of Yonkers Electric Power & Light bonds on behalf of the Carroll account and remitted the proceeds to Carroll. No one at Cannon checked the lost/stolen lists prior to this sale.

26. Pershing & Company maintained an inventory of both street name and bearer investment securities. Pershing audited its inventory of these securities quarter-annually and performed an audit in January 1971.

27. On or about April 16, 1971, Pershing began to notice irregularities with respect to its inventory of securities and began its quarterly annual audit. Pershing first compared the securities physically present in Pershing's vault with the amount of securities on its books. This revealed the amount of missing securities of each issue but not the specific serial numbers of the missing securities.

28. Beginning on April 20, 1971, Pershing tried to ascertain the serial numbers of the securities lost or stolen. As the serial numbers of the securities were obtained, Pershing alerted the New York Stock Exchange by lost security flyers which the Exchange circulated to its members.

29. Cannon was not a member of the New York Stock Exchange and did not receive copies of the Pershing flyers.

30. Pershing relied on its advice to the New York Stock Exchange with respect to the securities and did not purchase the services of a firm to send notices of these security serial numbers to each brokerage office in the United States.

31. Pershing provided the respective interest paying agents and/or transfer agents with a list of serial numbers of the missing securities.

32. Pershing notified the New York Stock Exchange and the interest paying agent for the Yonkers Electric bonds of their loss on April 27, 1971.

33. Pershing sent the New York Stock Exchange the first list of serial numbers for the Gulf & Western bonds on May 6, 1971; the maturity date and the interest payment dates reported by Pershing were inaccurate and were amended on August 16, 1971.

34. Pershing first reported to Bankers' Trust Company, interest paying agent for the Gulf & Western bonds, that some of such bonds were lost or stolen on May 28, 1971, eleven days after the last Morris Carroll Gulf & Western trade. A call to such agent by Cannon prior to the trades would not have resulted in notice of an adverse claim.

35. At the time of the trades on April 20 and May 13–17, 1971, Cannon did not have actual notice of Pershing's claim to the bonds.

36. In August 1971, when Paciolla was on vacation, Cartier delivered $10,000.00 of Pacific Gas & Electric Company and $49,000.00 of Wisconsin Central Railroad bearer bonds to Cannon. Dan Weintraub, Cannon securities salesman, telephoned Paciolla to request instructions and Paciolla told him to sell.

37. On August 12, 1971, after delivery but before settlement of the Pacific and Wisconsin bonds, purchasers advised Cannon that the Gulf & Western bonds and Yonkers Electric bonds had been stolen from Pershing.

38. In accordance with the NASD practice, the purchasing brokers tendered the allegedly stolen bonds to Cannon and purchased replacement bonds in the open market.

39. Cannon paid the purchasing brokers the cost of obtaining such replacement bonds, $89,049.46.

40. On August 13, 1971, Williams on behalf of Cannon contacted the FBI, which required possession of the stolen bonds.

41. The FBI advised that at least some of the bonds were reported as stolen. Cannon believed the FBI would return the bonds at the conclusion of its investigation.

42. The FBI executed requested receipts.

43. Thereafter, representatives of INA contacted both the FBI and the U.S. Attorney's office concerning the status of the investigation to determine when the bonds would be returned to INA. INA was advised that the investigation was proceeding.

44. The FBI delivered the bonds to Pershing on November 8, 1974 without notice to INA or to Cannon. INA was advised of the transfer to Pershing on April 12, 1977.

45. Among the bonds delivered to Cannon for sale for the Carroll account, subsequently delivered by Cannon to the FBI, and then by the FBI to Pershing, were $23,000.00 (face amount) of Wisconsin Central bonds and $4,000.00 (face amount) of Pacific Gas & Electric bonds which Pershing never reported as lost or stolen to New York Stock Exchange members or to the issuers or interest paying agents. Pershing took these bonds into its inventory to offset its loss on other unrecovered stolen bonds.

46. Pershing sustained a loss of some securities of the two bond issues in question but did not establish that these particular bonds were ever the property of Pershing. The Court rejects Pershing's contention that it merely erred in reporting the serial numbers on the Pacific Gas & Electric bonds.

47. The Carroll Estate brought suit against Cannon in the Court of Common Pleas of Philadelphia County, Pennsylvania in which plaintiff asserts a claim based on the value of the Pacific Gas & Electric and Wisconsin Central Railroad bonds.

48. Morris Carroll acquired all the bonds at issue for cash at race tracks in the Philadelphia area at a purchase price no more than 25% of their market value.

49. No documentation was requested by or given to Cannon in connection with the delivery of any of these securities by Mr. Cartier on behalf of Morris Carroll.

50. None of the information about Morris Carroll given to Cannon by Cartier was true. Carroll did not maintain a bank account at First Pennsylvania Bank, did not reside on Indiana Avenue, and was not retired. Cartier misrepresented that he was a financial consultant when he was a Fagan Brothers Furniture Company salesman of small appliances and clothing. None of these facts was known by Cannon until August 12, 1971.

51. Cartier and Carroll omitted to state that Carroll was also known by at least one alias, Moe Nudelman and also omitted to state the means by which Carroll acquired the bonds.

52. No Power of Attorney was required of Mr. Cartier nor did Cannon confirm the fact that it was Carroll who desired to sell the bonds.

53. Based on Mr. Paciolla's demeanor at trial and inconsistencies in his testimony, *See,* Defendants' (Pershing and U.S.) Supplemental Requests for Findings of Fact and Conclusions of Law at 3–4, he is devoid of credibility as to any material fact at issue.

## II. DISCUSSION

In early 1971 bearer bonds having a total face value in excess of $2.4 million were stolen from Pershing in New York City. From April, 1971 until August of that year Cannon, a securities broker-dealer with offices in Flourtown, Pennsylvania, sold certain bearer bonds for the account of a new customer named Morris Carroll. The bonds were purchased at a race track for approximately 20 or 25% of their face value although this was not then known to Cannon. In August, 1971, Cannon learned that many, if not all, of the bonds sold for Morris Carroll were stolen. Cannon promptly notified the FBI which requested that Cannon deliver the bonds to the agency to aid in its investigation. Cannon did so as the

bonds were returned to Cannon by subsequent purchasers. On November 8, 1974, the FBI gave the bonds ($172,000 in face value) to Pershing. On March 18, 1977, INA, as subrogee and assignee of Cannon, formally requested return of the bonds from the FBI but was advised on April 12, 1977 that the bonds had been delivered to Pershing. On July 29, 1977 plaintiff INA instituted suit.

The claims of INA against Pershing are based on diversity of citizenship; the court must apply the conflict of law rules of the state in which it sits, Pennsylvania. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The claims against Pershing involve securities covered by Article 8 of the UCC and accordingly, the Pennsylvania courts would apply the choice of law provision contained in the UCC, § 1–105. Under § 1–105, absent agreement of the parties, the Pennsylvania UCC applies to transactions bearing an "appropriate relation" to the Commonwealth. Here, the transactions between Cannon and Carroll from which this cause of action arises occurred in Pennsylvania; therefore, the transactions bear an appropriate relationship to Pennsylvania. Its commercial code and relevant statute of limitations will be applied.

The claims against Carroll are based on the Securities Exchange Act. No federal statute imposes an express limitation upon actions brought under § 10(b). In such circumstances a federal court must apply the limitations law of the state in which it sits. *Roberts v. Magnetic Metals Co.,* 611 F.2d 450, 452 (3d Cir.1979). Therefore, Pennsylvania law supplies the limitations period although, as to this claim, federal law will determine from when the elapsed time is calculated.

### A. *INA v. Pershing*

INA sued Pershing for wrongful transfer of the bonds, pursuant to UCC § 8–315, and for the common law tort of conversion.

Pershing contended that the then applicable six-year period of limitations for conversion had expired. That period commenced when INA learned of or should have known of the conversion. Pershing obtained the bonds from the FBI on November 8, 1974 but INA did not learn of this until April 12, 1977. Suit was filed on July 29, 1977. There is no reason to believe INA should have known of the FBI's actions at any time prior to April, 1977. But even if the limitations period begins on the date of transfer (November 8, 1974), the suit is timely filed. Nor is the defense of laches sustainable on the facts of this case; the lawsuit was commenced only several months after INA learned of the alleged conversion. Therefore, INA's claim is not time barred.

The transactions which resulted in this action involve "securities" in bearer form as defined by Article 8 of the UCC § 8–102(1)(a) and (d), and are governed by that Article, § 8–102(1)(b). INA asserts that Cannon, its subrogor and assignor, was a bona fide purchaser of the bonds (UCC § 8–302), and therefore, even though the bonds were stolen from Pershing, Cannon acquired them "free of any adverse claim," (UCC § 8–301(2)). Section 8–301(2) protects a bona fide purchaser of investment securities by permitting acquisition of a "perfect title." 12A P.S. § 8, Part 3, Pennsylvania Bar Association Notes—1953, Introductory Comment.

A bona fide purchaser is defined by § 8–302 as "a purchaser for value in good faith and without notice of any adverse claim who takes delivery of a security in bearer form or of one in registered form issued to him or endorsed to him or in blank." The UCC definition requires the following: 1) a purchaser, 2) value, 3) good faith, 4) no notice of any adverse claim. INA has the burden of proving that its insured, Cannon, satisfied each element for all bonds to which Pershing has established ownership.[2] § 8–105(2)(d); *Oscar Gruss &*

---

**2.** A different burden of proof obtains for the $27,000 of bonds for which Pershing has not established ownership.

*Son v. First State Bank of Eldorado,* 582 F.2d 424 (7th Cir.1978); *Phoenix Insurance Co. v. National Bank & Trust Co.,* 366 F.Supp. 340 (M.D.Pa.1972), *aff'd,* 485 F.2d 681 (3rd Cir.1973).

A "purchaser" is one who takes an interest in property by a voluntary transaction, § 1–201(32), (33); a broker for a seller or buyer is considered such a purchaser, § 8–304, and Comment 4. "Purchase," as defined by § 1–201(32), includes the taking of an instrument by negotiation. Bearer instruments are negotiated by delivery alone. § 3–202; *Gruss, supra* at 428 n. 4. Consequently, in all the trades for the Morris Carroll account Cannon became a purchaser when it acquired the bearer securities for sale.

A person (or broker in this case) gives "value" for rights if he acquires them in return for any consideration sufficient to support a simple contract. § 1–201(44)(d). Cannon paid Carroll a total of $91,610.33 in six (6) installments, representing the proceeds of sales of $93,000 of Gulf & Western Industries 5¼% Convertible Subordinated Debentures due July 1, 1987 and $20,000 of Yonkers Electric Light & Power Co. 2⅝%, due July 1, 1976. As to these bonds Cannon gave "value." Plaintiff contends that it also gave value for other securities[3] sold for Carroll for which he had not yet received the proceeds when it was discovered that the bonds Carroll previously presented for sale might have been stolen. The alleged value is the claim asserted by the Carroll Estate against Cannon in a state court action. Section 1–201(44)(d) and Comment 4 to § 8–304, cited by the plaintiff, do not support its position. *Cf., Prisbrey v. Noble,* 505 F.2d 170, 176 (10th Cir. 1974); (contingent liability arising out of an indemnity agreement previously executed held to constitute value). The trades of Gulf & Western and Yonkers Electric stock

are the only ones as to which Cannon was a "purchaser for value."

Good faith is defined as "honesty in fact in the conduct or transaction concerned." UCC § 1–201(19). The question of good faith under this section focuses on the subjective intent with which the purchaser acted. *Gruss, supra* at 432; *Miriani v. Rodman & Renshaw, Inc.,* 358 F.Supp. 1011 (N.D.Ill. 1973). Cannon has met this element of the good faith test. The record does not support a finding that Cannon acquired the securities in bad faith with knowledge of their infirmities or that Cannon failed to make further inquiries as part of a "deliberate desire on [its] part to evade knowledge because of a belief or fear that investigation would disclose a vice in the transaction." *First National Bank of Blairstown v. Goldberg,* 340 Pa. 337, 17 A.2d 377 (1941).[4] *See also, S.E.C. v. Investors Security Corp.,* 415 F.Supp. 745 (W.D.Pa.1976), *vacated in part on other grounds,* 560 F.2d 561 (3d Cir.1977).

But requirements in addition to "honesty in fact" are required for "good faith" under other provisions of the Code. *See,* § 1–201 Comment 19. Section 8–318 provides that "an agent or bailee who in good faith . . . has received securities and sold, pledged, or delivered them according to the instructions of his principal is not liable for conversion or for participation in breach of fiduciary duty although the principal has no right to dispose of them." For such persons, good faith includes "observance of reasonable commercial standards if he is in the business of buying, selling or otherwise dealing with securities," as is Cannon.

By its terms, § 8–318 applies only to an agent's liability for conversion or breach of trust where the rightful owner seeks to recover and brings an action for conversion against the entities dealing with the bonds after they were wrongfully removed from

---

**3.** $10,000 of Pacific Gas & Electric AA 5% due June 1, 1991; $40,000 of Wisconsin Central Railroad 4% due January 1, 2004; and $9,000 of Wisconsin Central Railroad 4½% due January 1, 2029.

**4.** Although *Goldberg* was decided under the former Negotiable Instruments Law, repealed upon enactment of the U.C.C., the decision was cited with approval by the drafters of the UCC, *see,* 12A P.S. § 8–318, Pa.Bar Assoc. Notes—1953, and therefore may be considered in applying the UCC provisions.

the owner's possession. *See, e.g., Gruss, supra; U.S. Fidelity & Guaranty Co. v. Royal National Bank of N.Y.,* 413 F.Supp. 43 (E.D.N.Y.), *aff'd,* 545 F.2d 1330 (2d Cir. 1976); *Colin v. Central Penn National Bank,* 404 F.Supp. 638 (E.D.Pa.1975) *aff'd,* 544 F.2d 512 (3d Cir.1976); *Morgan Guaranty Trust Co. of N.Y. v. Third National Bank,* 400 F.Supp. 383 (D.Mass.1975), *aff'd,* 529 F.2d 1141 (1st Cir.1976); *Miriani, supra; Goldberg, supra.* Here the original owner of the stolen bonds has regained their possession and the plaintiff is claiming the status of a bona fide purchaser. But if the FBI had not returned the bonds, Pershing would have sued Cannon and Carroll for conversion.[5] The liability of Cannon, as agent for Carroll, for conversion would have been governed by § 8–318; Cannon's good faith would be measured by its observance of reasonable commercial standards. *Gruss, supra; Morgan Guaranty, supra; Royal Bank, supra; cf., Matter of Legel, Braswell Gov't Securities,* 648 F.2d 321 (5th Cir.1981); *but see, Colin, supra.*

Cannon's good faith does not depend upon whether Cannon or Pershing brought this action. Even though this action is not by the true owner for conversion of an agent, the court concludes that the § 8–318 standard is applicable. The court must consider if Cannon observed reasonable commercial standards in determining if it met its burden of proving good faith.

■ After considering industry practices testified to at trial and reviewing the actual practices it followed, the court concludes that Cannon did not observe reasonable commercial standards in the Carroll transactions. The testimony established that at the time of the events at issue some of the larger brokerage houses required proof of ownership before selling bearer bonds, although *written* proof was not required by NASD or PBW rule. This proof would consist of delivery receipts or confirmation by the broker who transferred the bonds to

the current bearer. If dealing with a third party rather than directly with a principal, the industry practice was to require either a power of attorney or oral confirmation by the principal. A broker was expected to know his customer and to check his creditworthiness. Prior to approving a transaction involving bearer bonds, brokers would check lost/stolen fliers and/or contact the transfer agent responsible for such bond. Picking up bearer securities outside the office was a permissible service to the customer if the customer was provided a receipt itemizing the securities. Prepayment to a customer before settlement was acceptable only if the broker had the bonds in hand and there was a valid reason for the prepayment request. The industry practice was that the securities be delivered to the broker within five business days of the transaction date so that a broker could sell bonds before physically receiving them unless it was a first transaction with a new customer.

Cannon did not follow several of these industry practices in the Carroll transactions. Paciolla, Cannon's salesman, knew little about Cartier, who posed as a financial consultant but in reality sold clothing and appliances from the back of a van. Paciolla made no attempt to verify Cartier's status as a financial consultant. At most, Paciolla had several conversations but transacted no business with Cartier before the transactions in suit. There was no reason for Paciolla to suspect Cartier but there was no reasonable basis to rely on him either. *Cf. U.S.F. & G. Co. v. Royal National Bank of N.Y.,* 545 F.2d 1330 (2d Cir.1976) (person attempting to negotiate stolen bonds was first introduced to bank by local reputable businessman, was an officer of a credit union which was also a long time customer of bank, and was himself a bank customer).

The stolen bearer bonds were delivered to Paciolla not at his office but at a street

---

**5.** If the bonds remained in Cannon's possession, Pershing could have brought an action pursuant to § 8–315 for wrongful transfer. But such an action would not preclude resort to common law action for conversion. § 8–315, Comment 2; *N.J. Bank N.A. v. Bradford Securities Operations, Inc.* 690 F.2d 339 (3d Cir. 1982).

corner in Philadelphia.[6] Paciolla did not give Cartier a receipt for these bonds. However, Cartier provided certain information as to Morris Carroll: an address, phone number, social security number, bank reference, former occupation, net worth and marital status.

On April 20, 1971, Paciolla filled out a new account form with this information and delivered it to Mr. Williams' secretary. Paciolla did not personally verify any of the information he received about Carroll and he did not indicate on the form that the information was provided by a third person. Paciolla did not speak to Morris Carroll prior to submitting the new account form or initiating the first sale of bonds.[7]

Williams stated that when a form went to his secretary, her practice was to check the address and bank reference if possible and report any problems to Williams. His secretary did not testify but Williams recalled no problems reported regarding the Carroll account, although his address was later found to be incorrect. The testimony does not establish the First Pennsylvania Bank was contacted; Williams testified at that time the bank would not release information about its customers. Williams did not know whether or not there was a credit check on Carroll, although such checks were made on every fifth or sixth account of "size." This would have been important where there was no verification of the bank reference and all account information was provided by a third party.

Harry Byerly, operations manager at Cannon, checked the lost/stolen fliers for the first two sales of Gulf & Western bonds. The testimony fails to establish that anyone at Cannon checked these fliers before sale of the remaining Gulf & Western bonds or the Yonkers Electric bonds. Nor did anyone contact the interest payment agent of these bonds.[8]

Paciolla never asked Cartier where Carroll had obtained the bonds, why Carroll was selling them in small lots over time, or why someone whose net worth was stated to be $100,000 was selling bonds with face value in excess of $170,000. Cartier requested prepayment of the first sale. Prepayment was requested approximately three or four times per month of approximately seven or eight thousand transactions per year. The record does not establish any reason given for the prepayment request. Although Williams testified that the reason for each prepayment had to be reported to the PBW, neither he nor Byerly[9] could recall what was done in this case. This prepayment request should have further alerted Cannon to the unusual nature of the transaction.

There is no one factor in this case that determines Cannon's non-compliance with reasonable commercial standards. But in view of all the circumstances—Paciolla's limited knowledge of Cartier, failure to verify any information about Carroll and his acquisition or ownership of the bonds or to check with Carroll prior to sale, the manner in which the bonds were sold, the quantity of bonds, and the failure to check whether certain of the bonds were listed as missing—Cannon was so careless in conducting these transactions that it cannot be said to have observed reasonable commercial practices. The court concludes that Cannon did not act in good faith.

■ These same circumstances impute notice to Cannon which also defeats its

---

**6.** Paciolla testified that Cartier brought the first bonds sold to Cannon's office but the court does not credit this testimony.

**7.** Paciolla testified that he had no recollection of speaking with Carroll but he thought he must have called him. The court does not believe that Paciolla called Carroll.

**8.** The Gulf & Western interest paying agent was not contacted by Pershing until after the Gulf & Western bond sales by Cannon. Some Gulf & Western bonds were incorrectly reported missing/stolen in a May 6, 1971 flier; accurate information was not provided until August 16, 1971. The Yonkers Electric interest paying agent had been notified prior to the Cannon sale of Yonkers Electric bonds.

**9.** At his deposition, Byerly stated that he doubted if a reason for the prepayment had been furnished to the PBW.

claim as a bona fide purchaser. Notice includes both actual knowledge and reason to know under all the facts and circumstances. § 1–201(25). Cannon did not have actual knowledge of any adverse claim to these bonds by Pershing. Nor did the securities contain any restrictive endorsement or statement to indicate they were the property of another; § 8–304(1)(a) and (b). But Cannon had reason to know of Pershing's claim from all the facts and circumstances and had constructive notice under § 1–201(25)(c).

"Suspicious circumstances of the transaction may give a purchaser (particularly a commercially sophisticated purchaser such as a broker) 'reason to know'" of an adverse claim. § 8–304, Comment 1; *Gruss, supra* at 431 n. 6. Cannon while not a large brokerage house was in the securities business and must be held to the standards of a commercially sophisticated purchaser. The circumstances of the Carroll transactions heretofore described were sufficiently suspicious to Cannon, a commercially sophisticated purchaser, so that it had reason to know of the adverse claims. *Cf. Colin, supra.* Therefore, Cannon did not act in good faith and without notice of Pershing's claims; it was not a bona fide purchaser of the bonds and INA may not claim such status through it.

Although Cannon was not a bona fide purchaser in its own right, INA argues in the alternative that it was a bona fide purchaser under the "shelter doctrine" which provides that "the purchaser acquires the rights in the security which his transferor has." § 8–301. Thus, if INA established that Carroll was a bona fide purchaser, Cannon/INA would also acquire the rights of a bona fide purchaser. However, based on the testimony that was introduced concerning Carroll's acquisition of these

bonds at racetracks for 20 to 25% of their face value the court cannot find that Carroll took the bonds in good faith without notice of adverse claims.

■ Because INA is not a bona fide purchaser as to the bonds reported stolen by Pershing, Pershing is not liable for conversion of those bonds. This leaves in issue only the $27,000 face amount of "good bonds" which were bonds never reported stolen by Pershing. Pershing has failed to establish ownership of these bonds.[10] Therefore, it was not necessary for INA to prove that Cannon was a bona fide purchaser as to those bonds. Cannon had a right to sell those bonds and to obtain their proceeds as against Pershing.[11]

■ Because Pershing has wrongfully asserted a claim of ownership to the "good bonds," Cannon was deprived of the value of these bonds from August 12, 1971, the date that they originally were sold. A conversion is treated as a forced sale of property. *Horne v. Francis I. DuPont & Co.,* 428 F.Supp. 1271 (D.D.C.1977). Therefore, INA is entitled to receive as compensation the fair market value of the bonds on the date of the conversion, which was $13,853.75. So that INA may be fully compensated for its lost use of the money, INA is entitled to receive additional damages for the delay at the rate of 6%, which the court determines to be a fair rate on this record. *Peterson v. Crown Financial Corp.,* 661 F.2d 287, 293–94 (3d Cir.1981); *Citizens' Natural Gas Co. v. Richards,* 130 Pa. 37, 18 A. 600 (1889).

### B. *INA v. U.S.*

INA asserts jurisdiction over defendant US under the Tucker Act, 28 U.S.C. § 1346(a)(2) and the Federal Tort Claims Act, 28 U.S.C. § 2674. Plaintiff claims that

---

**10.** Pershing has asserted that four Pacific Gas and Electric bonds were reported as stolen but that the report listed them incorrectly because of a typographical error. The court finds this insufficient to establish a claim of ownership. The other twenty-three Wisconsin Central Railroad bonds were never reported stolen by Pershing and Pershing has not otherwise established its ownership.

**11.** In deciding Cannon's claim to these bonds against Pershing, the court does not address the respective rights of INA and Carroll. That issue is the subject of a pending action in state court.

upon delivery of the stolen bonds to the FBI, the government agency became bailee of the bonds for the benefit of INA and that an express and an implied promise [12] to redeliver the bonds were made. *Alliance Assurance Co. v. U.S.,* 252 F.2d 529 (2d Cir.1958). The FBI executed receipts for the $172,000 face value bearer bonds which they took from Cannon.

■ Contract claims against the US exceeding $10,000 can only be asserted in the Court of Claims, *Putnam Mills Corp. v. U.S.,* 432 F.2d 553 (2d Cir.1970) (per curiam); 28 U.S.C. §§ 1346(a)(2), 1491. The district court does not have the power to sever one claim against the US into multiple civil claims so that no claim is greater than $10,000. *Eccles v. U.S.,* 396 F.Supp. 792 (D.C.N.D.1975). Therefore, there is no jurisdiction over the US under the Tucker Act.

The Federal Tort Claims Act provides that no actions can be instituted against the US unless an administrative claim is first presented to the appropriate federal agency (within two years after the claim accrues). The administrative claim must contain written notification of the incident together with a claim for money damages in a sum certain. 28 C.F.R. § 14.2. This claim must be finally denied by the agency in writing. 28 U.S.C. § 2675(a). Failure of an agency to make a final disposition of a claim within six months is deemed a final denial of the claim and suit can be instituted. 28 U.S.C. § 2675(a).

The FBI took the bonds from Cannon between August, 1971 and March, 1972. INA instituted this suit on July 29, 1977. The complaint was filed within six years after the earliest date any right of action against the US might have accrued. 28 U.S.C. § 2401(a). The US asserts that no proper administrative claim was made under the Act. However, on July 26, 1977 INA wrote a letter demanding return of the bonds. This letter was sufficient to

constitute a claim; it contained notification of the incident and stated the bonds were worth "approximately $170,000 in face amount." *Bialowas v. U.S.,* 443 F.2d 1047 (3d Cir.1971); *Walley v. U.S.,* 366 F.Supp. 268 (E.D.Pa.1973), *aff'd,* 546 F.2d 421 (E.D. Pa.1976).

The US also asserts that this claim was not presented in writing to the agency within two years of the alleged conversion on November 8, 1974 and therefore is barred by the limitations provision of 28 U.S.C. § 2401(b). But under the Federal Tort Claims Act, a cause of action accrues and the limitation period begins to run when the claimant discovers, or in exercise of reasonable diligence should have discovered, the existence and cause of his injury. *U.S. v. Kubrick,* 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). The FBI gave the bonds to Pershing on November 8, 1974. The FBI was aware of INA's interest in the bonds but did not tell INA that the bonds had been delivered to Pershing until April 12, 1977 (P–28). Since INA made claim on July 26, 1977 and filed suit on July 29, 1977, the action is not time barred for that reason.

■ But § 2675(a) of the Federal Tort Claims Act requires that an administrative claim is both presented within two years after the claim accrues and is finally denied before suit is commenced (within six months of final denial). Failure of an agency to make a final disposition within six months may be deemed a final denial. The provisions of § 2675(a) are jurisdictional and are to be interpreted strictly although this occasionally leads to harsh results. *Bialowas, supra; Rosario v. American Export—Isbrantsen Lines, Inc.,* 531 F.2d 1227 (3d Cir.), *cert. denied,* 429 U.S. 857, 97 S.Ct. 156, 50 L.Ed.2d 135 (1976). At the time the complaint was filed, only three days had elapsed from the filing of the administrative complaint. The suit against the US was commenced prematurely and

---

**12.** Any implied promise that arose would be to return the bonds to the "lawful owner" after the FBI had completed their investigation. *Alliance Assurance Co. v. U.S.,* 252 F.2d 529 (2d Cir.1958). Thus any promise would not extend to the stolen bonds because Cannon was not a bona fide purchaser and therefore not the lawful owner of the bonds.

the court lacked subject matter jurisdiction over the claims against the US at the time it was filed. *Morano v. U.S. Naval Hospital,* 437 F.2d 1009 (3d Cir.1971); *Caton v. U.S.,* 495 F.2d 635 (9th Cir.1974); *Walley, supra.*

At the time of trial, more than six months had elapsed from the date of filing the administrative complaint without any final decision. Although in some cases the jurisdictional defect has been considered cured where the six-month period has elapsed prior to any substantial progress in the litigation, *Kubrick v. U.S.,* 435 F.Supp. 166, 168 (E.D.Pa.1977), *aff'd,* 581 F.2d 1092, 1098 (3d Cir.1978), *rev'd on other grounds,* 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979), the court does not believe this should be the case here where the filing of the lawsuit within three days of submitting the administrative claim can only be considered a deliberate flouting of the requirement that an agency have six months free of litigation to attempt to resolve the matter. Plaintiff's claim against the U.S. must be dismissed.[13]

### C. *INA v. Carroll*

Plaintiff alleges jurisdiction under § 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa and asserts claims pursuant to § 10(b) and Rule 10b–5 thereunder and a pendent claim for fraud under the common law of Pennsylvania. INA asserts liability of the Estate of Morris Carroll for sums Carroll received from Cannon for sale of the bonds on the ground that Carroll himself or through his agent Cartier made misrepresentations and omissions of material facts on which Cannon relied to its detriment. A § 10(b) action can be brought by a purchaser or seller of a security against a person who has used any manipulative or deceptive device or contrivance in connec-

tion with the purchase or sale of a security; 15 U.S.C. § 78j. However, a § 10(b) plaintiff must prove that the defendant acted with *scienter, i.e.,* with intent to deceive, manipulate or "defraud." *Herman & MacLean v. Huddleston,* —— U.S. ——, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

The court assumes that the transaction between Cannon and Carroll was in connection with the purchase or sale of a security, *cf.,* "churning" cases cited in *Biggans v. Bache Halsey Stuart Shields,* 638 F.2d 605, 609 (3d Cir.1980), and that the conduct of Cartier is imputed to Carroll. But *cf., Rochez Brothers, Inc. v. Rhodes,* 527 F.2d 880 (3d Cir.1975) (Rochez II) and *Gould v. American-Hawaiian Steamship Co.,* 535 F.2d 761, 779 (3d Cir.1976) with *Sharp v. Coopers & Lybrand,* 649 F.2d 175 (3d Cir. 1981), *cert. denied,* 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982). It is clear that both Carroll and his agent Cartier misrepresented numerous facts that were material to Cannon's decision to transact bearer bonds sales for Carroll.

Carroll and Cartier misrepresented that Carroll maintained an account at the First Pennsylvania Bank; however, Joseph Koscinski, a bank representative, testified that there was *no account in 1971 maintained by* the bank for Carroll under either his own name or his alias, Moe Nudelman, nor was any account maintained there by Cartier. Cartier misrepresented that Carroll was retired when he was operating a television repair store in the northeastern section of Philadelphia.

There was a misrepresentation that Carroll resided on Indiana Avenue, when the uncontradicted evidence was that Carroll lived elsewhere; Carroll gave a different address when one of the Cannon checks was endorsed. The most serious misrepresenta-

---

**13.** The court has also considered that upon the FBI's delivery of the bonds to Pershing, Pershing executed an agreement to indemnify the government and hold it harmless from any liability arising from return of the bonds. Thus the US would at most be secondarily liable for conversion and even then only as to those bonds which Cannon had a right to possess, *i.e.,* the $27,000 of "good bonds."

The correct procedure for the FBI to have followed in this case was to deposit the bonds in an escrow account or with the court and implead Cannon and Pershing so that their conflicting claims, of which the FBI was aware, could be determined. *Gutekunst v. Continental Insurance Co.,* 486 F.2d 194 (2d Cir.1973).

tions involved Cartier's agency. Although Cartier was and had been for 23 years, a route salesman for Fagan Brothers Furniture Store, Cartier misrepresented himself as a full-time financial consultant. Neither Carroll nor Cartier told Cannon that Carroll used at least one alias, Moe Nudelman. Finally, Carroll and Cartier failed to advise Cannon that Carroll had purchased the bonds for cash from gamblers frequenting horse racing tracks in the Philadelphia area. The purchases were at 20 to 25% of market value with no questions asked or documentation required.

Reliance is an element of a plaintiff's action for damages under rule 10b–5.... The obvious reason for this requirement is that a plaintiff in a rule 10b–5 action should not be allowed to recover damages when the defendant's wrongful action had no relationship to the plaintiff's loss. *See* 3 A. Bromberg, Securities Law § 8.7, at 213 (1979). Reliance is therefore one aspect of the ubiquitous requirement that losses be causally related to the defendant's wrongful acts.... Normally, a plaintiff suing under rule 10b–5 bears the burden of proving all the elements of his case. (Citations omitted).

*Sharp, supra* at 186, 187.

■ It is clear that the plaintiffs in a § 10(b) suit must prove their case only by a preponderance of the evidence. *Herman & MacLean, supra.* Nevertheless, the necessity of an element to a valid claim does not determine the allocation of the burden of going forward and persuasion with respect to that element. In our Circuit, the flexible approach to the problem of reliance has been to analyze the plaintiff's allegations and determine the most reasonable burden of proof of reliance under the circumstances of the case. 649 F.2d at 188–189. Assuming that the preponderance of the evidence supports a finding that Cannon had relied on Cartier's fraudulent representations and omissions about Carroll, the reasonableness of this reliance would remain for consideration because as to Pershing, Cannon had not observed reasonable commercial standards in conducting the transaction. But the court need not resolve this issue because it

concludes that plaintiff's action against Carroll is barred by the applicable statute of limitations.

In the absence of a federal statute expressly providing a period of limitations for private actions based on § 10(b) of the Securities Exchange Act, selection of an appropriate limitations period from the law of Pennsylvania, the forum state, requires application of the statute of limitations governing common law fraud. *Biggans, supra.* "Prior to June 27, 1978 the statute of limitations for a common law fraud action was six years. 12 P.S. § 531 (Purdon 1953) .... On June 27, 1978, the Judiciary Act of 1976, which created the Judicial Code, became effective. The Code repealed various statutes of limitation, including Pa.Stat. Ann. Tit. 12, § 31, and established a new limitations scheme. *See,* Act of July 9, 1976, Act No. 142, 1976 Pa.Laws 586; codified at 42 Pa.C.S.A. §§ 5521–5536 ·(1978) ...." *Biggans, supra,* at 607 n. 2 (citations omitted). INA commenced this action on July 29, 1977, prior to the effective date of the Code; therefore, the issue is whether it was filed within six years of the fraud, the period of limitation prior to Code's effective date.

Although state law provides the limitations period, federal law determines when the period commences to run. Under the federal equitable tolling doctrine the statute does not run until the plaintiff knew or exercising reasonable diligence should have known of the fraudulent conduct. *Biggans, supra,* at 607, 608 n. 3.

The bonds at issue were transmitted for sale no earlier than April and no later than August 10, 1971. Checks were paid to the customer on April 21, April 28, May 19, May 21, May 24 and June 4. No payment was made for the bonds delivered in August because notice of a claim that the bonds were reported stolen was received prior to payment. N.T. 117. Even though some of the bonds were discovered missing and presumed stolen from Pershing as early as April 16, 1971, there is no evidence that Cannon knew the bonds were stolen prior to

August 12, 1971. Some of them were delivered to FBI Agent James Carroll on August 13 and Williams, Cannon's president and major shareholder believed the telephone call from Harry McKay, of Laird, Bissel & Meeds, Inc., one of the purchasers, came the previous day. Mr. Williams then reviewed the lists of lost or stolen securities fliers in the possession of Cannon. N.T. 81. None of the bonds at issue appeared. N.T. 85. Therefore, the first actual knowledge of the facts giving rise to a cause of action against Carroll was less than six years prior to July 29, 1977, the day this action was filed.

However, the determinative issue is when plaintiff in the exercise of reasonable diligence should have known of the misrepresentations. Since liability is asserted not for stealing the bonds but for misrepresenting and omitting to state material facts relating to the sale, the test is reason to know, not that the bonds were stolen but that the representations of Cartier and Carroll were either untrue or unreasonable to believe in whole or in part. That time was when the misrepresentations were made and Cannon's agents, experienced securities dealers, had reason to know from the totality of the circumstances that something was amiss. If Cannon could not be a bona fide purchaser for the reasons already stated, it was because it did not exercise due diligence; therefore, it had reason to know at least of the misrepresentations if not the omissions even without actual notice. The exercise of due diligence at the time the bearer bonds were first transmitted for sale would have disclosed some if not all the omissions as well. Because in the exercise of due diligence, Cannon had reason to know of any Rule 10b–5 violations in late April, May or June, 1971, more than six years prior to the filing of this action on July 29, 1977, Cannon would be barred by the applicable statute of limitations. INA's rights as assignee of Cannon can be no greater than those of its assignor. Therefore, INA cannot recover against the Estate of Carroll for any violation of federal securities law (Count II). For the same reason, INA cannot recover for common law fraud (Count III). However, because plaintiff's federal claim against Carroll must be dismissed, the pendent state claims should be dismissed as well. *Weaver v. Marine Bank,* 683 F.2d 744 (3d Cir.1982).

In Count IV, plaintiff seeks a declaratory judgment that Cannon and INA are not liable to the Estate of Carroll in an action pending in the Court of Common Pleas of Philadelphia County, May Term, 1975, No. 5098 in which Cannon and INA are defendant and third-party defendant respectively. There is no diversity of citizenship among the parties in that state action and in any event it could not be removed to federal court by the defendants who are citizens of the forum state, 28 U.S.C. § 1441(b). It would be improper to enter a declaratory judgment as to whether Carroll can recover as plaintiff in that action. Of course, this would not preclude any *res judicata* effect the findings herein are given by state law in the state action.[14]

### III. CONCLUSIONS OF LAW

1. The court has jurisdiction over the person and over the subject matter as to defendant Pershing under 28 U.S.C. § 1332 and as to defendants Norman and William Carroll, Administrators of the Estate of Morris Carroll, deceased, under the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* and 28 U.S.C. § 1331.

2. The court does not have subject matter jurisdiction over the United States of America under the Tucker Act, 28 U.S.C. §§ 1346(a), 1491 or the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2674.

3. INA was not a bona fide purchaser of the $93,000 of Gulf & Western or $20,000 of Yonkers Electric Power & Light Co. bonds which had been stolen from Pershing.

    a. INA's assignor, Cannon, failed to observe reasonable commercial standards and therefore did not take the bonds in good faith.

---

**14.** That certain of plaintiff's claims are barred by the limitations period in this action does not mean that they could not serve as valid counterclaims or defenses if properly raised in the earlier filed state court action.

b. Because of the suspicious circumstances surrounding the transactions, Cannon had reason to know of Pershing's claims and therefore did not take the bonds without notice of adverse claim.

Pershing is not liable to INA for conversion of the stolen bonds.

4. Pershing has not established a claim of ownership to $27,000 worth of "good bonds." These bonds are identified as follows:

Wisconsin Central Railroad, First Mortgage Series A, 4% bonds due January 1, 2004:

| | | | | |
|---|---|---|---|---|
| M 11611 | M 8882 | M 8940 | M 682 | M 5776 |
| M 11612 | M 11242 | M 7126 | M 8706 | M 11990 |
| M 1863 | M 11243 | M 7127 | M 7090 | M 12181 |
| M 1864 | M 11244 | M 4853 | M 7675 | |
| M 8881 | M 12155 | M 4854 | M 10569 | |

Pacific Gas & Electric Co. First Mortgage Series EE 5% bonds due June 1, 1991:

| | |
|---|---|
| M 15876 | M 15878 |
| M 15877 | M 15879 |

It was not necessary for INA to establish it was a bona fide purchaser as to these bonds. INA's assignor, Cannon, had a right to the value of these bonds either in its own right or on behalf of Carroll. Pershing interfered with Cannon's right to possess the value of the "good bonds" on or about August 12, 1971 and thereafter. Cannon is entitled to damages in the amount of $23,475.25, calculated as follows:

Principal –

| | |
|---|---|
| 23 x 476.25 | = $10,953.75 |
| 4 x 725 | = $ 2,900.00 |
| Subtotal | $13,853.75 |

Interest –

| | |
|---|---|
| 6% from August 13, 1971 – March 4, 1983 | $ 9,603.50 |
| TOTAL | $23,457.25 |

5. INA's claim against the Carroll Estate under the Securities Exchange Act is barred by the applicable statute of limitations. INA's pendent state law claims are dismissed.