FRANCIS O. J. SMITH *vs.* ELBRIDGE G. HARLOW *et al.*

*Certain circumstances held not sufficient evidence of a purchase in bad faith.*

One Nash living in New York prior to and on the eighth day of December, 1869, had entrusted to him by the plaintiff a lot of railroad bonds for the purpose of effecting a loan by a pledge of them. Nash delivered several of them, on that day, to one Wood only to be carried across the hall-way for exhibition to a person whom Wood represented was in an office there and likely to make the loan. Wood promised to return them to Nash immediately, but instead of doing so absconded and though prompt efforts were made for his arrest and the recovery of the bonds,—the loss of which was at once advertised in the New York papers,—neither of these objects was ever accomplished. Two of these bonds, for $500 each, some time afterward, came into the hands of a New York banker who wrote to Gould, one of the defendants, cashier of the First National Bank of Portland, to see if a sale could be made of them. In the course of a conversation had between him and Harlow, the other defendant, in the month of January, 1872, Mr. Gould mentioned the receipt of this letter and asked Harlow what he would give for them, proposing to transmit any proposition he might make. After some hesitation and parley, Harlow said he would give a hundred dollars for them and no more; which offer being communicated to the New York holder of the bonds was accepted by him and a sale of the bonds to Harlow for this sum completed. In the spring of 1873, Mr. Smith, having learned of this purchase, took Mr. Gould's deposition in *perpetuam* by which it appeared that he did not know his New York correspondent, nor give his name to Harlow, who did not ask for it; and he declined to examine the books and files of his bank to see who that person was, he having forgotten the name at the time of deposing; giving as the reason for his refusal that it would require too much time. He also stated that, not being a broker, the transaction was not a frequent or ordinary one to him. Upon this state of facts the plaintiff brought trover contending that as the bonds were obtained and put into the market by fraud the burden of showing good faith in the purchase and want of notice was upon the defendants, and that they had not made out a defence to his action; but the court *held*, that,

Smith *v.* Harlow.

admitting the doctrine as laid down in *Aldrich* v. *Warren,* 16 Maine, 465, and *Perrin* v. *Noyes,* 39 Maine, 384, to be correct,—the defendants had shown a purchase for value, in good faith, and without notice of any fraud,—(both defendants testifying to their entire ignorance of the loss and advertisement of the bonds, and to their belief that the New York banker was a *bona fide* holder, and that the bonds were not commonly sold at the stock board and had no definite market value to their knowledge, the interest not being paid when due)—and that the action could not be maintained.

ON REPORT.

TROVER, brought September 13, 1873, to recover the value of two $500 bonds of the issue of May 20, 1863, by the Portland and Oxford Central Railroad Company, payable in ten years from date to the trustees therein named or bearer having three interest coupons attached to each bond. These coupons all fell due after the bonds were bought by Mr. Harlow, not being dishonored at the date of his purchase. The facts are indicated in the syllabus and are stated more fully in the opinion. Due demand before suit was admitted.

Upon so much of the evidence as was admissible, this cause was submitted to this court with jury powers. The bonds were placed in the hands of the court as evidence and in case of judgment for the plaintiff were to be delivered to him in satisfaction thereof; otherwise to be returned to Mr. Harlow; and no costs to be claimed in either event.

*F. O. J. Smith pro se.*

The case establishes that these bonds were fraudulently put into circulation, which throws the burden upon the defendants that they obtained possession of them fairly, without any knowledge of the fraud, in the ordinary course of business, unattended with any circumstances justly calculated to arouse suspicion. *Aldrich* v. *Warren,* 16 Maine, 465; *Perrin* v. *Noyes,* 39 Maine, 384; *Munroe* v. *Cooper,* 5 Pick., 412, and cases there collected.

Admitting that the defendants had no actual knowledge of the theft of these bonds, did they come into their hands in the ordinary course of business? Evidently not. Gould, the cashier of a leading bank, familiar with business, makes no inquiry how these

bonds, not often found in the market, came into the hands of a broker three hundred and fifty miles off, who is understood to be so solicitous to sell that Gould thinks (correctly as the result shows) he will take ten per cent. or less for them. Harlow does not even ask this New-Yorker's name, and Gould retains no recollection of it, and will not refresh his memory.

They had notice of these and other suspicious circumstances. "Notice or knowledge does not mean express notice, but the means of knowledge," which is "equivalent to notice." *May* v. *Chapman*, 16 Mees. & Wels., 360; *Goodman* v. *Simonds*, 20 Howard, 367; *Kimball* v. *Billings*, 55 Maine, 147; *Lawrence* v. *Norton*, 4 Esp., 56; *Murray* v. *Lardner*, 2 Wallace, 119; *Anderson* v. *Nicholas*, 28 N. Y., 604.

*E. G. Harlow* for the defendants.

The bonds were payable to bearer, not over-due, and nothing upon their face to excite suspicion. This case is to be decided then upon the facts after applying to them the mercantile law and usage relating to this class of paper. *Goodman* v. *Simonds*, 20 Howard, 367.

There was nothing unusual in the purchase; no suspicious circumstances, unless it be my payment of $100 in good money for the paper of that corporation! Mr. Gould is not liable in any event, the sale was by the New York broker directly to me. Mr. Gould being merely the medium of communication.

Barrows, J. The plaintiff sues in trover, for two $500 bonds of the Portland & Oxford Central Railroad Company dated May 20, 1863, and payable to trustees therein named or bearer, in tel years from date with three coupons attached to each, payabe respectively in May and November, 1872, and May, 1873.

The case is before us upon an agreed statement of facts and evidence from which it appears that on the eighth day of Deember, 1869, these and other similar bonds belonged to the plantiff and were placed by him in the hands of an agent, in the cty of New York, with authority to pledge them as collateral for loan.

Smith *v.* Harlow.

The agent intrusted them to one Wood who was to carry them to another office in the same building to exhibit them to a party whom Wood represented as ready to make the loan, but instead of doing so Wood absconded with the bonds, and though a warrant for his arrest was procured forthwith and diligent search made, neither the plaintiff nor his agent got any trace of Wood or of the bonds, with the single exception of one which was pledged to a western railroad conductor for the fare of an unknown passenger, until the two in controversy had come into the hands of the defendants, of whom the plaintiff demanded them, and upon their refusal to surrender them he brings this suit.

The loss of the bonds was advertised in one or more papers in the city of New York. But the testimony reported satisfies us also that neither of these defendants (one of whom, (Gould,) is and long has been cashier of the First National Bank in Portland, and the other a respectable member of the bar in Oxford county) had ever been informed of any of these occurrences, or of any loss of any such bonds by any one until long after these bonds were bought by said Harlow in January, 1872, under the following circumstances. He went to the bank of which the other defendant, Gould, was cashier, to pay certain town bonds which had been issued in aid of this same railroad, and after transacting his business was informed by Gould that a New York banker wanted to find a purchaser for one thousand dollars of the bonds of the railroad and was asked whether he did not want to purchase. Rather declining the proposition at first, he inquired the probable price and Gould said, "I don't know, perhaps twenty or twenty-five per cent., which Harlow refused to give, declaring it was more than they were worth, that they never paid any interest. Gould suggested that perhaps his correspondent would take less, that he would communicate such offer as Harlow saw fit to make, and the result was that Harlow authorized Gould to offer one hundred dollars for the bonds, which offer was communicated by Gould to the New York banker, accepted, the bonds forwarded to Gould who turned them over to Harlow, received the pay, and

transmitted it to the New York party. It does not appear that Harlow inquired who Gould's correspondent was. At all events he had no personal acquaintance with him. He had been informed that the railroad never paid its interest, had talked frequently before this with a respectable Portland broker about their value, though he made no inquiries pending the negotiation. Neither he, nor Gould, had ever known of any public sale of the bonds or that they had any public market value. There is no testimony tending to show that they had any other than a mere speculative value, or that the sum paid by Harlow was not as much as they were worth. At the time of the transaction the bonds were not due and no over-due coupons were attached to them. Both defendants declare they believed they received the bonds from a *bona fide* holder.

The matters relied on by the plaintiff to impeach the good faith of their purchase are that neither of the defendants had any personal knowledge of the seller, nor did they make any inquiries as to his title to the bonds; that the price paid was but an insignificant per centage of the face of the bonds; that Gould, when called upon at the plaintiff's instance between one and two years after the purchase to give his deposition *in perpetuam* in relation to it, declared himself unable to recall the name of the banker with whom he corresponded, or to produce his letters, or to fix the date of the transaction or to give any of its details, and declined to examine the files of his bank for the months of January, February and March in the years 1871 and 1872, with a view to ascertain to whom the pay for the bonds was remitted, alleging that it would take too much of his time, and because, as the plaintiff interprets his answer, Gould admits that it was not according to the usual course of business to buy bonds in that way. The plaintiff claims as matter of law that inasmuch as he lost the bonds by an act amounting to larceny, the burden of proof rests upon the defendants to show that their possession was acquired "fairly, in the due course of business, without knowledge of the fraud or felony, and unattended with circumstances justly calcu-

lated to awaken suspicion." He relies upon the decision of this court in *Aldrich* v. *Warren*, 16 Maine, 465, and *Perrin* v. *Noyes*, 39 Maine, 384.

We see no occasion to question the correctness of those decisions. They were made before the passage of the law allowing parties to be witnesses, and yet we are not aware that they were ever found to impose any unreasonable restraint upon any honest transactions in negotiable paper or securities. Since parties may be witnesses there is still less reason to apprehend such a result. The purchaser whose title is questioned may himself testify to the mode of its acquisition, to the time, place, and manner in which he made his purchase, and to all such declarations of the parties with whom he dealt as constitute part of the *res gestae*. His title if obtained without notice of the taint in that of the previous holder, and in the due and regular course of business (which of itself implies that the transaction is unattended with circumstances justly calculated to excite suspicion) will be sustained.

It is only when "the circumstances attending the negotiation are justly calculated to excite suspicion," that he is put upon inquiry.

That phrase is rather one which is descriptive of the character of the evidence that bears in such cases upon the vital matters of good faith and the regular course of business, than one which constitutes a rule in and of itself.

The essential questions are, did the purchaser deal in good faith and in the due course of business? When the proffered trade is attended with circumstances justly calculated to excite suspicion that the seller has no legal right to dispose of the property which he proposes to sell, not only does the regular course of business require a reasonable attempt to ascertain the facts, but under such circumstances a neglect to use the means at hand to ascertain them could scarcely be distinguished from the gross negligence which is so often held to be equivalent to bad faith.

Perhaps it would be more exact to say that it is evidence from which one could not fail to draw the conclusion that the purchaser was acting *mala fide* and not in the due course of business.

But when we come to apply the law as maintained by the plaintiff to the facts here presented, we feel bound to say that we think the burden of proof here cast upon the defendants is sustained.

The plaintiff justly remarks that it is of little importance who has that burden in a case presented as this is, substantially, upon facts agreed.

He makes no specific objections to any of the testimony reported. Looking to the character of the issue perhaps there was none to make. But the matters which may seem suspicious to the loser, do not present themselves to our minds as amounting to proof, that there were in that negotiation any circumstances justly calculated to awaken suspicion that the party, with whom the defendants dealt, had not good right and lawful authority to dispose of the bonds.

That Harlow, to whom the proposition to purchase was made through the cashier of a leading bank in Portland, should have made no inquiries about the New York banker was not strange.

If the security had been unquestionably good or possessed a known market value, and the price offered and accepted had been grossly inadequate, it would be a suspicious circumstance, but the case seems to have been the reverse.

Addressing a letter of inquiry to a large moneyed institution in the vicinity of the railroad, the officers of which, if the owner had been thoroughly diligent in making known his loss, would be likely to be informed of it, seems hardly the way that a thief would take to dispose of his plunder unless he courted detection.

It is a course more likely to be taken by a broker rightfully in possession who wanted to find a purchaser at some rate for a doubtful security. Considering the time which had elapsed since the theft and the greater facility for disposing of stolen property safely in New York, we incline to believe with the defendants that the party with whom they dealt was a *bona fide* holder.

The position of Gould is totally different from that of the defendant in *Kimball* v. *Billings*, 55 Maine, 147. There the defendant acted directly as the agent of the wrongful holder, took the bonds

and made the sale himself, and moreover it appears there that the proceeds, (or an equivalent amount to secure him) were in his hands when the suit was commenced and had not gone back to his principal.

Here, Gould seems to have intervened merely in courtesy to Harlow, with whom he had frequent dealings, and was his agent and messenger in the purchase. Were we satisfied that the New York banker was a wrongful holder, still Gould would not under such circumstances be responsible. *Burditt* v. *Hunt*, 25 Maine, 419.

As Gould had no pecuniary interest whatever, and the transaction was trivial in amount compared with his regular daily routine, it does not seem strange that he should have made no memoranda, preserved no correspondence, and recollected none of the details of a matter of which he probably never expected to hear again.

The question and answer from which it is assumed that he admits his action was not in the due course of business are as follows : "Is it customary for you to receive and sell any description of bonds for a stranger without any inquiry or knowledge of his ownership or of his possession of them ?" "I am not a broker— no, it is not." The answer implies that with brokers, unless there was something to excite suspicion in the offer, it would be customary. And as he did not make the sale, Harlow purchasing directly from the New York banker, there is nothing in this which has the force which the plaintiff seeks to give it. We find nothing in the case to overcome the testimony of the defendants that they acted in good faith ; nothing to invalidate the purchase under the doctrines of *Aldrich* v. *Warren* and *Perrin* v. *Noyes, ubi sup*.

*Judgment for the defendants.*

APPLETON, C. J., WALTON, DICKERSON, VIRGIN and PETERS, JJ., concurred.