First National Bank of Blairstown, Appellant,
*v.* Goldberg et al.

Argued December 3, 1940.   Before SCHAFFER, C. J.,
MAXEY, DREW, LINN, STERN and PATTERSON, JJ.

*Thomas F. Mount,* with him *Joseph W. Henderson,* of *Rawle & Henderson,* for appellant.

*C. Donald Swartz,* of *Swartz, Campbell & Henry,* with him *Herbert A. Barton,* for Land Title Bank and Trust Company, appellee.

*Otto Kraus, Jr.,* for appellee.

OPINION BY MR. JUSTICE STERN, January 6, 1941:

There is a singular dearth of authority in regard to the principal question involved in this case, which is whether a person who, as agent, assists another in the sale of stolen negotiable bonds, but turns over all the proceeds to his principal and acts throughout the transaction innocently and in good faith, is liable for conversion of the bonds in an action by the owner.

Defendant Bernard S. Goldberg, a member of the Philadelphia bar, became acquainted with one Max Gross, who visited Goldberg's law office and told him he was estranged from his wife, and that the latter was living in New York while he, Gross, had been living in Philadelphia for a year or more; he employed Goldberg to represent him in attempting to effect a reconciliation. He stated that, in order to effect a cash settlement with his wife, and to prevent her from attaching the proceeds of the sales, he desired to sell some bonds in Philadelphia. Goldberg had carried an account as attorney in defendant Land Title Bank & Trust Company for about two years. It was the practice of

that Company, as of other banking institutions, to render gratuitously to customers the service of selling securities through brokerage firms, and the Company had once previously effected the sale of some stock for Goldberg acting on behalf of a client. Accordingly, Goldberg took Gross to the Company, introduced him, explained why he desired to sell some of his bonds, and, on that occasion, delivered one bond to the Company for sale. The Company forwarded it to brokers who sold it in the regular course of business and remitted the proceeds, which the Company in turn credited, without charge, to Goldberg's account as attorney. Goldberg thereupon drew his check to the order of Gross, who cashed the check and appropriated the proceeds. While Goldberg received a moderate retainer from Gross in connection with the correspondence which he carried on with the attorney of Gross's wife in New York, he made no charge for his services in relation to the sale of this bond or subsequent ones. During the course of the following two or three months Gross brought to Goldberg other bonds which were sold through the Trust Company in the same manner as the first one, these transactions aggregating some $14,000 in amount; none of them is here in question. Finally came the sales which are involved in the present litigation, consisting of five bonds of New York, Chicago & St. Louis R. R. Co., one of New York Central R. R. Co., and two of the City of Rome, all payable to bearer and negotiable. It came to light that these bonds had been the property of plaintiff, First National Bank of Blairstown, and were stolen from it by armed robbers some five months before. Gross disappeared and his present whereabouts are unknown. The Bank brought suit against Goldberg and the Trust Company to recover the value of these eight bonds which it claimed had been converted by defendants. The jury rendered a verdict for plaintiff, but the court entered judgments for defendants n. o. v., from which plaintiff now appeals.

It was incumbent upon plaintiff to prove only its ownership and loss of the bonds, and the burden would then have shifted to defendants to show that they came into possession of the securities under such circumstances as to relieve them from liability for a conversion. Plaintiff, however, itself presented all the facts through cross-examination of Goldberg, and is bound by his testimony, there being no contradiction of it: *Krell v. Jacobson,* 314 Pa. 522, 527, 172 A. 697, 699. From that testimony no inference of bad faith on the part of either defendant can be drawn. Not only did Gross give a plausible reason why he wished to sell the bonds in Philadelphia, but Goldberg confirmed the truth of at least one phase of his story by carrying on a protracted correspondence with counsel in New York who represented Gross's wife. Nor, so far as the Trust Company is concerned, was there anything apparently irregular in the transactions. It knew Goldberg as a depositor and had once before effected a sale for him. Perhaps defendants should have been more circumspect in handling the bonds, and they might have made a more thorough examination into the identity and reliability of Gross, but with negotiable instruments the test is not care but good faith. To defeat the rights of one dealing with negotiable securities it is not enough to show that he took them under circumstances which ought to excite the suspicion of a prudent man and cause him to make inquiry, but that he had actual knowledge of an infirmity or defect, or of such facts that his failure to make further inquiry would indicate a deliberate desire on his part to evade knowledge because of a belief or fear that investigation would disclose a vice in the transaction. This test, that of good faith with respect to negotiable instruments, is prescribed alike at common law, by the Negotiable Instruments Law of 1901, P. L. 194, and by the Uniform Fiduciaries Act of 1923, P. L. 468: *Phelan v. Moss,* 67 Pa. 59; *Union Bank & Trust Co. v. Girard Trust*

*Co.,* 307 Pa. 488, 500, 501, 161 A. 865, 868, 869; *Davis, Trustee, v. Pennsylvania Company,* 337 Pa. 456, 459, 460, 12 A. 2d 66, 68, 69. There appearing in the testimony no circumstances to suggest knowledge on the part of defendants that Gross was not a holder of the bonds in due course, nor any bad faith on their part, and the evidence being undisputed and presented by plaintiff itself, it was proper for the court to declare as a matter of law that the facts conclusively established the innocence of defendants in the transactions: *Cochran v. Fox Chase Bank,* 209 Pa. 34, 39, 58 A. 117, 118; *Fehr v. Campbell,* 288 Pa. 549, 567, 568, 137 A. 113, 120; *Gordon, Secretary of Banking, v. Mapel,* 311 Pa. 523, 527, 165 A. 496, 497; *Employers' Liability Assurance Corporation, Ltd., v. Greenfield,* 316 Pa. 477, 175 A. 403.

This brings us to the fundamental question whether defendants should be held responsible for assisting in the sale of the bonds although they acted in the belief that the person who had authorized them to consummate the sales was the legitimate owner of the securities. Of course, the general rule is, as formulated in Restatement, Agency, section 349, that "An agent who does acts which would otherwise constitute conversion of a chattel is not relieved from liability by the fact that he acts on account of his principal and reasonably, although mistakenly, believes that the principal is entitled to possession of the chattels." Ordinarily, it is no defense to an action of trover that the defendant acted on behalf of another, because, if the principal is a wrongdoer, the agent is a wrongdoer also. But a distinction has been made in the few cases which have arisen where the chattels consisted of negotiable securities. Thus, in *Spooner v. Holmes,* 102 Mass. 503, it was held that an action for the conversion of coupons could not be maintained by the owner, from whom they had been stolen, against a person who had received them as an agent to get them exchanged on behalf of

the thief, where the agent acted in good faith and had turned over the proceeds to his principal without himself receiving any benefit from the transaction. And in *Pratt v. Higginson,* 230 Mass. 256, 119 N. E. 661, it was held that bankers who, in good faith, without notice, sold for an agent of the thief certain stolen bonds, were not liable for a conversion even though they received compensation for the sale. In *Gruntal v. National Surety Company,* 254 N. Y. 468, 173 N. E. 682, it was similarly held that brokers were not liable for conversion who sold stolen negotiable bonds but without knowledge of the theft.* The principle involved in these cases is recognized in Restatement, Agency, section 349, comment g, where it is said that "if an agent sells, on account of his principal, a negotiable instrument, the holder of which has the power to pass title, the agent does not commit conversion if he sells such instrument without notice of the rights of the person entitled to possession, although his principal is not a bona fide holder of the instrument," and in Restatement, Torts, section 233, subsection 4, as follows: "The statement in Subsection (1) [that one who as agent of another person disposes of a chattel is liable for a conversion to another who, as against his principal, is entitled to the immediate possession of the chattel] is not applicable to an agent or servant who disposes of current money or a document negotiable by common law or by statute pursuant to a transaction by which the transferee becomes a holder in due course of such money or document, unless the agent or servant knows or has reason to know that his principal or master does not have authority so to dispose thereof."

Apart from the authorities cited, it would seem clear that no liability should be imposed on agents or brokers

---

*Apparently the only other reported case is *Kimball v. Billings,* 55 Me. 147, which held contra, but there the agent who sold the bonds still retained the proceeds when sued; see *Smith v. Harlow,* 64 Me. 510, 516, 517.

acting innocently in such cases. The bonds, being negotiable, pass by delivery, and the transferee to whom they are sold, who takes them for value and in good faith, obtains a good title as against the real owner: *Cochran v. Fox Chase Bank,* 209 Pa. 34, 58 A. 117; *Porter v. Levering,* 330 Pa. 392, 397, 199 A. 482, 484. It would seem strange if the broker, who is thus the conduit of a valid title, should be held responsible for a conversion although he acted in the same good faith as the purchaser. In the present case, defendants did not part with value for the bonds, but they do not claim any right, title or interest therein as holders; they derived no benefit from the transactions, acting merely as agencies to place the bonds in the hands of brokers for sale and to transmit the proceeds in return. The purpose of the Negotiable Instruments Law is to enhance the marketability of such securities and to allow bankers, brokers and people generally to trade in them with confidence. That object would be defeated if liability were to be imposed upon one who, mistakenly but in good faith, deals with negotiable instruments on the assumption that they belong to the person who employs him to effect their sale through ordinary market channels.

Judgment affirmed.