256 N.J. Super. 23 (1992)
606 A.2d 389
CARNEGIE BANK, PLAINTIFF, APPELLANT-CROSS-RESPONDENT,
v.
ALAN B. SHALLECK AND GEORGIA MYERS SHALLECK, HIS WIFE, DEFENDANTS, RESPONDENTS-CROSS-APPELLANTS, AND AEGIS ENERGY SYSTEM, INC., A PENNSYLVANIA CORPORATION, AEGIS SYSTEMS CORPORATION, INC., A PENNSYLVANIA CORPORATION, ANN J. ANDERSON, DALE HAGAN, CROSSROADS MARKETING, INC., BANK OF COMMERCE, AND INTERNAL REVENUE SERVICE OF THE UNITED STATES OF AMERICA, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued March 9, 1992.
Decided April 9, 1992.
*26 Before Judges J.H. COLEMAN, STERN and KEEFE.
Bruce H. Snyder argued the cause for appellant-cross-respondent (Lasser, Hochman, Marcus, Guryan and Kuskin, attorneys; Bruce H. Snyder on the brief).
Richard S. Goldman argued the cause for respondents-cross-appellants (Drinker, Biddle & Reath, attorneys; Richard S. Goldman on the brief).
Dennis R. Casale and Audrey D. Wisotsky filed an amicus curiae brief on behalf of the New Jersey Bankers Association (Jamieson, Moore, Peskin & Spicer, attorneys; Dennis R. Casale, of counsel; Dennis R. Casale and Audrey D. Wisotsky on the brief).
The opinion of the court was delivered by COLEMAN, J.H., P.J.A.D.
The novel issue raised in this appeal is whether a mortgage note or promissory note requiring repayment at a variable interest rate renders the instrument non-negotiable. Another significant issue raised is whether N.J.S.A. 46:9-9, which permits a mortgagor to raise personal defenses and claims against an assignee of the mortgage, applies to a holder in due course of a mortgage note or promissory note secured by a mortgage.
*27 Plaintiff Carnegie Bank instituted suit on a variable interest rate note and sought to foreclose a mortgage given to secure the note. The mortgagor-maker of the note defended the suit by raising, among others, the personal defense of fraud in the inducement. As to the note he asserted that the variable interest rate note violates the "sum certain" requirement for negotiability in N.J.S.A. 12A:3-104 thereby preventing plaintiff from becoming a holder in due course. He defended the foreclosure action by contending there was fraud in the inducement of the note and mortgage which he could assert against plaintiff pursuant to N.J.S.A. 46:9-9 regardless of whether plaintiff was a holder in due course. The trial judge held that plaintiff did not become a holder in due course, and if it did, the mortgagor could still assert personal defenses in the mortgage foreclosure action pursuant to N.J.S.A. 46:9-9. We disagree with both holdings and reverse.

I
The facts giving rise to this litigation involve a convoluted commercial loan transaction, the details of which are essential to a determination of whether plaintiff received the variable interest rate note in good faith. For some time prior to 1986, defendant Aegis Energy Systems, Inc. (Aegis Energy) was a corporation engaged in the design, manufacture, sale and installation of energy saving devices for commercial establishments. Defendant Alan B. Shalleck served as its president. In June 1984 Industrial Valley Bank and Trust Company (IVB) issued a $150,000 line of credit to Aegis Energy and in turn Aegis Energy issued its note to IVB. Shalleck personally guaranteed repayment of the loan. As part of the loan transaction, Aegis Energy gave a covenant to maintain a net worth of $200,000, calculated by subtracting liabilities from assets. In November 1985 when Aegis Energy failed to satisfy the net worth covenant, Shalleck gave a second mortgage in the sum of $150,000 on his private residence, dated November 20, 1985, to collateralize his personal guarantee of the IVB loan.
*28 In 1986 Shalleck sought new investors for Aegis Energy to fund its operation, and he projected $500,000 would be needed. Peter Nisselson agreed to invest $325,000 if a new corporation was formed. To satisfy that condition, Aegis Systems Corporations, Inc. (Aegis Systems) was incorporated in September 1986. Aegis Systems agreed to guarantee payment of the IVB loan. Nisselson became the owner of all of Aegis Systems' outstanding stock. Shalleck became president of Aegis Systems.
As was expected by Shalleck, Nisselson's investment was not sufficient to design, manufacture and market the energy saving devices. Therefore, Shalleck in or about September 1987 renewed his search for additional venture capital for Aegis Systems. At the conclusion of a luncheon meeting at The Princeton Venture Capital Club in September 1987, where Shalleck had made a presentation, Shalleck met defendant Dale Hagan. Hagan introduced himself as president of defendant Crossroads Marketing, Inc. (Crossroads) which was in the business of raising venture capital for businesses.
By January 1988, Aegis Systems needed additional money since it had spent most of its development capital, and Fidelity Bank, the successor to IVB, was considering calling the IVB loan because Aegis Systems' net worth had fallen below $200,000. In an attempt to stay afloat, Aegis Systems entered into a six month contract with Crossroads in February 1988 to raise additional venture capital.
In late February or March 1988, Hagan approached the president of plaintiff Carnegie Bank, Thomas L. Gray, on behalf of Aegis Systems because Hagan knew this was a new bank and was actively soliciting business. Before Carnegie officially opened on March 21, 1988, Hagan and Gray visited Aegis Systems and met with Shalleck. Shortly after that meeting, Gray decided that Carnegie would not make a loan to Aegis Systems ostensibly because it "wasn't a real business." Carnegie did, however, extend a $10,000 line of credit to Hagan *29 on opening day when Hagan opened a checking account and subscribed to purchase shares of Carnegie stock.
In April 1988, Hagan and Gray met at a social affair. During the social meeting, Gray inquired whether a loan had been arranged for Aegis Systems. At that point Hagan proposed that Carnegie make a loan to Hagan or to Crossroads which would in turn make the loan to Aegis Systems. Gray instructed Hagan to call him on the next regular business day. At about this same time, Hagan proposed to Shalleck that Hagan or Crossroads would fund Aegis Systems by borrowing $150,000 from Carnegie and lending that money to Aegis Systems in exchange for a note from Aegis Systems. As part of that accommodation, Shalleck would have to give a mortgage on Shalleck's private residence to collateralize the note. Also, Shalleck would have to arrange for a transfer of the controlling interest in Aegis Systems to Hagan. Gray agreed that those conditions would be essential requirements for a loan to Hagan for Aegis Systems' benefit.
Ultimately, however, Gray approved a loan for the benefit of Aegis Systems that was different than noted above. Hagan represented to Gray and Carnegie that defendant Ann J. Anderson was his wife. Hagan persuaded Carnegie to make the loan to Anderson. Carnegie, with the knowledge of its president Gray, made a $150,000 loan to Anderson for the benefit of Aegis Systems. An additional $50,000 loan was to be made by Hagan to Aegis Systems; both loans were to be secured by a mortgage on Shalleck's private residence. The loan documents were drafted by counsel for Carnegie. Hagan also promised to have Crossroads supply some weekly operating capital to Aegis Systems. The present litigation is based upon the promissory notes, personal guarantees and mortgage executed at the loan closing.
The loan documents reveal that on July 11, 1988, defendant Anderson borrowed $150,000 from Carnegie and executed a "Mortgage Note" payable to the order of "Carnegie Bank." *30 The note required Anderson to repay the principal sum "with interest thereon from the date hereof at the annual rate of two (2%) percent in excess of the Lender's [Carnegie Bank] Floating Base Rate, as adjusted from time to time, calculated on the basis of a 360-day year for actual days elapsed...." That note also provided that it was secured by Anderson "assigning [her] interest in a certain Note in an original principal amount of $200,000.00 of even date herewith give[n] by Alan B. Shalleck, Aegis Energy Systems, Inc., and Aegis Systems Corporation, which Note is secured in part by a certain Mortgage of even date herewith by Alan B. Shalleck and Georgia Myers Shalleck...." This instrument shall be referred to as the Anderson note.
Simultaneously with the execution of the Anderson note, defendants Alan B. and Georgia Myers Shalleck, as husband and wife, executed a mortgage to "Ann J. Anderson, a married individual" for $200,000 with interest at "[t]wo (2%) percent in excess of the Floating Base Rate of Carnegie Bank, as adjusted from time to time, provided, however, that at no time shall the rate be less than fifteen (15%) percent per annum." The stated consideration for the mortgage was "a loan that Alan B. Shalleck, Aegis Energy Systems, Inc. and Aegis Systems Corporation received." The mortgage covered the same premises encumbered by the IVB mortgage.
The mortgage note which was executed with the $200,000 mortgage listed the borrowers as Alan B. Shalleck, Aegis Energy Systems, Inc., and Aegis Systems Corporation. Alan B. Shalleck signed the note in his individual capacity as well as president of each of the two corporations. Dale Hagan signed it as "Assistant Secretary" without any further specificity. The note provides for payment of interest at the same variable rate specified in the mortgage. These two instruments shall be referred to as the Shalleck note and mortgage.
Also on July 11, 1988, Ann J. Anderson, "a married woman," for and in consideration of $150,000, assigned the $200,000 *31 Shalleck mortgage as security together with the Shalleck note to Carnegie Bank. To complete the $200,000 loan transaction, Hagan gave a demand note for $50,000 to Aegis Systems. Hagan also promised to have Crossroads invest between $4,000 and $7,000 per week in Aegis Systems as working capital. Hagan also guaranteed Carnegie repayment of the $150,000 loan made to Anderson. Anderson received a security interest in Aegis Systems' inventory, fixtures, equipment and receivables.
The $150,000 loan proceeds were disbursed as follows: $102,421.70 to pay off the IVB mortgage held by its successor Fidelity Bank, for which Anderson took an assignment of that mortgage rather than discharge it; $3,000 to Carnegie as a loan fee; $6,125 legal fees; $37,682.40 to Aegis Systems as working capital; and the balance in miscellaneous closing fees.
Hagan failed in his promise to pay the $50,000 note on demand. He also failed to invest any money from Crossroads into Aegis Systems. When the $37,682.40 from the Carnegie loan was exhausted, Aegis Systems defaulted on its loan obligation as well as its obligations to its workers and creditors.

II
Plaintiff instituted the present litigation on April 18, 1989, and the complaint was amended on June 16, 1989. Plaintiff sought foreclosure under the Shalleck mortgage, cancellation and discharge of the IVB mortgage from the record which had been assigned to Anderson, judgment against Anderson on her note, judgment against Hagan on his guaranty, judgment against Shalleck on his note and judgment against Anderson and Hagan under a personal line of credit advanced to them.
The Shalleck defendants filed an answer in which they raised several defenses, including fraud in the inducement by Anderson and Hagan respecting the Shalleck mortgage and note and the failure of plaintiff to become a holder in due course of the Shalleck note. The Shalleck defendants also filed *32 a cross-claim against Anderson, Hagan and Crossroads. Anderson and Hagan filed answers and cross-claims and Crossroads filed an answer.
A bench trial was conducted in December 1990. The trial judge rendered his decision on December 21, 1990. Pertinent to this appeal, are the following findings of fact and legal conclusions that: (1) Anderson and Hagan defrauded Shalleck and Carnegie without Carnegie's knowledge, (2) Carnegie did not become a holder in due course of the Shalleck note because the note did not require the payment of a "sum certain," and (3) even if Carnegie became a holder in due course, Shalleck could still assert the personal defense of fraud against Carnegie by virtue of N.J.S.A. 46:9-9.
Carnegie has appealed, contending essentially that it is a holder in due course and that N.J.S.A. 46:9-9 does not apply to holders of negotiable instruments secured by a mortgage. The Shallecks have cross-appealed from that portion of the final judgment holding Carnegie took their mortgage and mortgage note without notice of the alleged fraud.

III
Our legal analysis of the issues presented must begin with the meaning of a holder in due course under the Uniform Commercial Code (Code), N.J.S.A. 12A:1-101 et seq.; N.J.S.A. 12A:3-302. For if plaintiff did not become a holder in due course of the Shalleck note, the appeal could be decided based on N.J.S.A. 46:9-9 and general equitable principles rather than under the Code. But if plaintiff is a holder in due course, N.J.S.A. 12A:3-305(2) would preclude Shalleck from asserting his personal defense of fraud during the inception of the mortgage note and mortgage, N.J. Mortgage & Investment Co. v. Dorsey, 60 N.J. Super. 299, 158 A.2d 712 (App.Div.), aff'd, 33 N.J. 448, 165 A.2d 297 (1960), unless N.J.S.A. 46:9-9 requires a different result.
*33 The Code defines a holder in due course as one who takes a negotiable instrument for value, in good faith and without notice of any defense or claim against it. N.J.S.A. 12A:3-302; N.J.S.A. 12A:3-102(1)(e). One of the requirements for a note to be a negotiable instrument is that it must "contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power given by the maker or drawer except as authorized by this Chapter...." N.J.S.A. 12A:3-104(1)(b).

A
First we address the cross-appeal in which Shalleck contends that Carnegie did not take the note and mortgage in good faith or without knowledge of the Shallecks' defense. In a bench trial, the judge found that plaintiff did not have actual knowledge that Anderson and Hagan had defrauded Shalleck when plaintiff became a holder of the Shalleck note and mortgage. The judge found that the fraud consisted of Hagan and Anderson falsely representing that they were married, and that Hagan had the financial ability and intention to advance $50,000 to Aegis Systems, plus $4,000 to $7,000 per week as operating capital by Crossroads. Anderson also defrauded Shalleck and Carnegie by taking an assignment of the IVB mortgage rather than discharging it on the record. The judge stated that "Hagan was a charlatan in all his dealings leading to the making of the loan in question, and Anderson, as his `wife' was intimately involved." Thus Anderson and Hagan defrauded both the Shallecks and Carnegie.
The judge further found that plaintiff "was especially careless in making the loan, apparently because it was newly chartered," and because it failed to require a loan application of Anderson or audited statements from Hagan and Crossroads. He found that although Carnegie was negligent in failing to obtain a proper investigation and verification before making the loan, that conduct did not constitute notice of the Shallecks' claim or defense under the Code. The absence of good faith *34 required proof of actual bad faith such as fraud. N.J.S.A. 12A:1-203. He concluded that mere suspicious circumstances were insufficient to establish the absence of good faith and that "Carnegie had no actual knowledge of the fraud procured by Hagan upon Shalleck, and its conduct did not amount to `bad faith.'" These finding are amply supported by the record. Meshinsky v. Nichols Yacht Sales, Inc., 110 N.J. 464, 475, 541 A.2d 1063 (1988); Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 483-484, 323 A.2d 495 (1974).
Shalleck argues on this appeal, as he did in the trial court, that as between himself and Carnegie, Carnegie was clearly in a better position to discover the fraud perpetrated by Anderson and Hagan. While the Code recognizes that negligence may contribute to an alteration of or an unauthorized signature on a negotiable instrument, N.J.S.A. 12A:3-406, such negligence may not be asserted against a holder in due course. Nor may negligence be asserted here because this case involves neither an alteration nor an unauthorized signature. Beyond the limited scope of N.J.S.A. 12A:3-406, negligent principles do not apply under the Code. Brogan Cadillac-Oldsmobile Corp. v. Central Jersey Bank and Trust Co., 183 N.J. Super. 333, 443 A.2d 1108 (Law Div. 1981), aff'd o.b., 190 N.J. Super. 500, 464 A.2d 1141 (App.Div. 1983); Gast v. American Cas. Co. of Reading, Pa., 99 N.J. Super. 538, 542-545, 240 A.2d 682 (App.Div. 1968).
We believe General Investment Corp. v. Angelini, 58 N.J. 396, 403-404, 278 A.2d 193 (1971), requires us to affirm the trial judge's finding that Carnegie did not take the Shalleck note in bad faith. There it was stated:
Good faith is determined by looking to the mind of the particular holder. New Jersey Study Comment 1B to N.J.S.A. 12A:3-302, at p. 134; 12A:201(19). The test is neither freedom from negligence in entering into the transaction nor awareness of circumstances calculated to arouse suspicions either as to whether the instrument is subject to some defense not appearing on its face or whether the promise to pay is not as unconditional as it appears therein. Joseph v. Lesnevich, 56 N.J. Super. 340, 348 [153 A.2d 349] (App.Div. 1959). However, evidence of circumstances surrounding the negotiation of the note which excite *35 question as to whether the obligation it represents is really dependent upon performance of some duty by the payee is of probative value if it provides some support for a finding of a bad faith taking by the holder. Id. at 348 [153 A.2d 349].... Ordinarily where the note appears to be negotiable in form and regular on its face, the holder is under no duty to inquire as to possible defenses, such as failure of consideration, unless the circumstances of which he has knowledge rise to the level that the failure to inquire reveals a deliberate desire on his part to evade knowledge because of a belief or fear that investigation would disclose a defense arising from the transaction. Id. at 349 [153 A.2d 349]; First Nat'l Bank of Blairstown v. Goldberg, 340 Pa. 337, 17 A.2d 377, 379 (1941). And, in this connection, once it appears that a defense exists against the payee, the person claiming the rights of a holder in due course has the burden of establishing that he is in all respects such a holder. N.J.S.A. 12A:3-307. [Ibid.]
While plaintiff should have employed better banking practices in deciding whether to make the loan to Anderson with or without Hagan's guaranty, no evidence was presented which indicated that Carnegie was aware or even suspected a fraud was being perpetrated. Indeed, the only proof of fraud was based on Anderson's and Hagan's conduct after the loan had been closed. It cannot be said that there was any "deliberate desire on [Carnegie's] part to evade knowledge because of a belief or fear that investigation would disclose a defense arising from the transaction." Id. 58 N.J. at 404, 278 A.2d 193. Consequently, the cross-appeal is without merit and will be dismissed.

B
Secondly, we consider whether the Shalleck note was rendered non-negotiable because it provided for repayment at a variable interest rate rather than a rate fixed by the four corners of the note. If the note was not negotiable, plaintiff could not become a holder in due course. The trial judge found that the "sum certain" requirement of N.J.S.A. 12A:3-104(1)(b) was not satisfied by the provision in the note that interest was payable at "[t]wo (2%) percent in excess of the Floating Base Rate of Carnegie Bank, as adjusted from time to time, provided, however, that at no time shall the rate be less than fifteen (15%) percent per annum."
*36 The Code does not define "sum certain"; it only enumerates factors which do not destroy the "sum certain" requirement for negotiability. N.J.S.A. 12A:3-106(1) provides:
(1) The sum payable is a sum certain even though it is to be paid
(a) with stated interest or by stated installments; or
(b) with stated different rates of interest before and after default or a specified date; or
(c) with a stated discount or addition if paid before or after the date fixed for payment; or
(d) with exchange or less exchange, whether at a fixed rate or at the current rate; or
(e) with costs of collection or an attorney's fee or both upon default.
Official Comment 1 to § 3-106 of the Code states that the interest computation "must be one which can be made from the instrument itself without reference to any outside source, and this section does not make negotiable a note payable with interest `at the current rate.'" The comment does not, however, cover a situation where the rate can be determined by reference to a generally accepted published index.
Whether a variable interest rate renders the instrument non-negotiable raises a question of first impression in this State. Other jurisdictions have answered both ways. Some states have held generally that variable rate notes are not negotiable. See In re Gas Reclamation, Inc. Securities Litigation, 741 F. Supp. 1094 (S.D.N.Y. 1990), app. dismissed, 924 F.2d 448 (2d Cir.1991) (applying Texas law); National Union Fire Ins. Co. of Pittsburgh, Pa. v. Tegtmeier, 673 F. Supp. 1269, 1271-1272 (S.D.N.Y. 1987); Northern Trust Co. v. E.T. Clancy Export Corp., 612 F. Supp. 712 (N.D.Ill. 1985); Wattles v. Agelastos, 27 Mich. App. 624, 183 N.W.2d 906 (1970); Centerre Bank of Branson v. Campbell, 744 S.W.2d 490 (Mo. App. 1988); Lexington Ins. Co. v. Gray, 775 S.W.2d 679 (Tex. App. 1989); Taylor v. Roeder, 234 Va. 99, 360 S.E.2d 191 (1987); Farmers Production Credit Ass'n v. Arena, 145 Vt. 20, 481 A.2d 1064 (1984).
Yet, some courts have held that certain variable interest rate provisions in notes do not affect negotiability. See First City Federal Sav. Bank v. Bhogaonker, 715 F. Supp. 1216, 1219-1220 *37 (S.D.N.Y. 1989); Tanenbaum v. Agri-Capital, Inc., 885 F.2d 464 (8th Cir.1989); Klehm v. Grecian Chalet, Ltd., 164 Ill. App.3d 610, 115 Ill.Dec. 662, 518 N.E.2d 187 (1987); Universal C.I.T. Credit Corp. v. Ingel, 347 Mass. 119, 196 N.E.2d 847 (1964); Woodhouse, Drake & Carey Ltd. v. Anderson, 61 Misc.2d 951, 307 N.Y.S.2d 113 (Sup.Ct. 1970); Goss v. Trinity Sav. & Loan Ass'n, 813 P.2d 492 (Okla. 1991).
Prior to the trial in this case, the National Conference of Commissioners on Uniform State Laws proposed an amendment to § 3-112 of the Uniform Commercial Code to permit the use of variable interest rates without affecting negotiability. The proposal was approved by the American Law Institute in 1990. The new revision with Comment is as follows:[1]
Sec. 3-112. Interest.
(a) Unless otherwise provided in the instrument, (i) an instrument is not payable with interest, and (ii) interest on an interest-bearing instrument is payable from the date of the instrument.
(b) Interest may be stated in an instrument as a fixed or variable amount of money or it may be expressed as a fixed or variable rate or rates. The amount or rate of interest may be stated or described in the instrument in any manner and may require reference to information not contained in the instrument. If an instrument provides for interest, but the amount of interest payable cannot be ascertained from the description, interest is payable at the judgment rate in effect at the place of payment of the instrument and at the time interest first accrues.

*38 OFFICIAL COMMENT
1. Under Section 3-104(a) the requirement of a "fixed amount" applies only to principal. The amount of interest payable is that described in the instrument. If the description of interest in the instrument does not allow for the amount of interest to be ascertained, interest is payable at the judgment rate. Hence, if an instrument calls for interest, the amount of interest will always be determinable. If a variable rate of interest is prescribed, the amount of interest is ascertainable by reference to the formula or index described or referred to the formula or index described or referred to in the instrument. The last sentence of subsection (b) replaces subsection (d) of former Section 3-118.
2. The purpose of subsection (b) is to clarify the meaning of "interest" in the introductory clause of Section 3-104(a). It is not intended to validate a provision for interest in an instrument if that provision violates other law. [Code, U.C.C.Rep.Serv. (Callaghan), U.C.C.Rev. § 3-112, at 31 (1991.)]
Two months before The American Law Institute was scheduled to discuss the proposed amendment in May 1990, and before the trial in this case, Senate Bill No. 2431 was introduced in the New Jersey Senate on March 8, 1990, essentially to adopt the proposal submitted to The American Law Institute. Senate Bill No. 2431 was enacted into law on January 9, 1992, as L. 1991, c. 355, effective immediately. L. 1991, c. 355 amends N.J.S.A. 12A:3-106(1)(a) to add "a stated rate of interest." Of greater significance is the addition of N.J.S.A. 12A:3-106(3), which reads:
A rate of interest that cannot be calculated by looking only to the instrument is "a stated rate of interest" in subsection (1) of this section if the rate is readily ascertainable by a reference in the instrument to a published statute, regulation, rule of court, generally accepted commercial or financial index, compendium of interest rates, or announced or established rate of a named financial institution.
You will recall that the Shalleck note was executed and delivered on July 11, 1988. Thus, we must decide whether the L. 1991, c. 355 is to be retroactively applied to this case.

C
We recognize that as a general rule, New Jersey courts favor prospective application of new statutory enactments. Dewey v. R.J. Reynolds Tobacco Co., 121 N.J. 69, 95, 577 A.2d 1239 (1990); South Hamilton Assoc. v. Mayor and *39 Council of Morristown, 99 N.J. 437, 444, 493 A.2d 523 (1985); Gibbons v. Gibbons, 86 N.J. 515, 521, 432 A.2d 80 (1981); Small v. Dep't of Corrections, 243 N.J. Super. 439, 447, 579 A.2d 1263 (App.Div. 1990); Grippo v. Schrenell & Co., 223 N.J. Super. 154, 161, 538 A.2d 404 (App.Div. 1988). The reason for this general rule is that retroactive application of new statutes carries a high risk of unfairness. Gibbons, supra, 86 N.J. at 522, 432 A.2d 80. However, there are three recognized exceptions to the general rule: (1) where the Legislature expressly or impliedly intends retroactive application; (2) where a statute is ameliorative or curative, and (3) where the expectations of the parties will be enhanced. Id. at 522-524, 432 A.2d 80; Grippo, supra, 223 N.J. Super. at 161-162, 538 A.2d 404; 2 Norman J. Singer, Sutherland, Statutory Construction, § 41.11 at 410-411 and § 41.05 at 366 (4th ed. 1986).
A statement attached to the legislation is a useful aid in ascertaining legislative intent. Morris and Essex Investment Co. v. Director of Div. of Taxation, 33 N.J. 24, 33-34, 161 A.2d 491 (1960). The sponsor's statement as well as the Senate Labor, Industry and Professions Committee's statement to the legislation provide that:
This bill amends one of the provisions in the Uniform Commercial Code which establish the criteria for a negotiable instrument by providing that a variable rate of interest which requires reference to a source outside the instrument itself in order to ascertain the amount due would not make the instrument non-negotiable. Some courts in other states have ruled that instruments with variable interest rates tied to a market or other index are non-negotiable.
The clear implication is that even though no New Jersey decision has found that § 12A:3-106 rendered instruments with variable interest rates non-negotiable, other courts have and the Legislature wanted to clarify New Jersey's position on the issue before any decisions were rendered.
We believe the 1992 amendment is curative and it also enhances the expectation of the parties. The curative exception to the general rule of non-retroactivity includes "curative acts [which] are made necessary by inadvertence or error in the *40 original enactment of a statute or in its administration." 2 Sutherland, supra, § 41.11 at 410. Under this exception, the new statute is intended simply to explain and to clarify the existing law rather than to change the meaning of the original law. Looked at in that light, no retroactive application is necessary because the meaning of the original statute has always been the same. Kendall v. Snedeker, 219 N.J. Super. 283, 287, 530 A.2d 334 (App.Div. 1987); see also First City Federal, supra, 715 F. Supp. at 1219-1220. Our conclusion that the new statute is curative is predicated on the same principle which persuaded the Court in Gibbons, supra, 86 N.J. at 524, 432 A.2d 80, to observe "[the new legislation] reflects the Legislature's attempt to improve a statutory scheme already in existence" by bringing the law into harmony with the expectations of the parties and the law in the commercial marketplace.
Prior to enactment of L. 1991, c. 355, the variable interest rate involved in this case did not violate the "sum certain" requirement. The provisions of N.J.S.A. 12A:3-106, which predated the 1992 amendment, did not expressly or impliedly state that variable interest rates ascertained by reference to a published source constituted an uncertain sum. As noted above, only Official Comment 1 to § 3-106 suggests that variable interest rates do not represent a sum certain because computations of the interest requires the holder to look beyond the four corners of the instrument. That comment is drawn into question by the statute itself.
Indeed, N.J.S.A. 12A:3-106(1)(d) provides that an amount payable is nonetheless a "sum certain" even though it is to be paid "with exchange or less exchange, whether at a fixed rate or at the current rate." In that instance, a variable rate is implicated, and the sum certain can be computed only by reference to a source outside the four corners of the instrument. In addition, N.J.S.A. 12A:3-106(1)(e) contemplates reference to a source outside of the instrument in order to compute the "costs of collection or an attorney's fee or both upon *41 default." See also N.J.S.A. 12A:3-105(1)(e) and 12A:3-112(1)(b). We find the language in the Code itself more compelling than one of its Comments.
A contrary interpretation of the Code at the present time would require us both to ignore pertinent language in the Code and to disregard the reality in the commercial marketplace. The Code directs that its provisions "be liberally construed and applied to promote its underlying purposes and policies," some of which are "to simplify, clarify and modernize the law governing commercial transactions" and "to permit the continued expansion of commercial practices through custom, usage and agreement of the parties." N.J.S.A. 12A:1-102(1), (2)(a) and (b). Variable interest rate mortgage notes have been popular over the last ten years and many commercial lenders have become heavy investors in this State and elsewhere in reliance upon their negotiability. Goss, supra, 813 P.2d at 498; Janine S. Hiller and Stephen P. Ferris, Variable Interest Rates and Negotiability: A Response, 94 Com.L.J. 48, 50-54 (1989). The use of variable interest rates in mortgage notes is precisely the type of the expanded commercial practice that N.J.S.A. 12A:1-102 seeks to protect without hurting the borrowers. This expanded commercial practice has made more people eligible to obtain home mortgages, thereby helping to implement our national public policy of making affordable and decent housing available to more people.
We believe in keeping with the intent and purpose of the Code, we should be flexible in our construction of the Code to meet developing commercial usage. The fact that a "sum certain" is nowhere defined in the Code suggests that the drafters anticipated evolving changes in commercial practices. We are persuaded that Comment 1 to § 12A:3-106 merely represented the prevailing view amongst business people at that time. But in this age of advanced computer technology, the rationale which undergirds Comment 1 no longer prevails. In today's business world, the sum due on variable interest rate *42 notes tied to a fixed index, can literally be ascertained by pressing a few keys on a computer and/or telephone. Consequently, we agree with the reasoning employed in Tanenbaum, supra, and conclude that the sum certain contemplated by N.J.S.A. 12A:3-106 means commercial certainty and not mathematical certainty. Commercial certainty exists so long as the sum due can be readily ascertained by reference to some established rules, commercial indices or tables. Such a definition, in our view, comports with both the predictability and flexibility contemplated by the Code.
Furthermore, our determination that the new statute is curative does not alter any of Shalleck's rights and obligations. He fully intended to execute a variable interest rate mortgage note and he obligated himself to repay $150,000 to Carnegie Bank at the variable interest rate tied to the floating base rate at Carnegie Bank. Aegis Systems, of which Shalleck was the president, received the intended benefit of the loan proceeds, less the stated fees. Part of the money, as expected, was used to cancel the IVB mortgage so that the Shalleck mortgage which was assigned to Carnegie Bank would in effect replace the IVB mortgage in terms of priority. Even though Anderson took an assignment of the IVB mortgage rather than discharge it, the trial judge has already and properly ordered it canceled and discharged on the record. Finally, $37,682.40 of the loan proceeds went into Aegis Systems' working capital as contemplated by Shalleck. Carnegie Bank was found to be free of any fraud which was perpetrated by Anderson, Hagan and Cross-roads. Under these circumstances, as between plaintiff and Shalleck, retroactive application of the amendment to N.J.S.A. 12A:3-106 would not be unfair to the Shallecks.
We hold therefore that the sum certain requirement of § 12A:3-106 was satisfied by the variable interest rate note and Carnegie became a holder in due course of the Shalleck note. But the principal sum on the note is limited to $150,000 plus interest and default penalties as specified in the note.

*43 IV
Finally, we address the issue whether N.J.S.A. 46:9-9 permits Shalleck to assert a personal defense of fraud in the inducement of the mortgage and note against a holder in due course. N.J.S.A. 46:9-9 provides:
All mortgages on real estate in this State, and all covenants and stipulations therein contained, shall be assignable at law by writing, whether sealed or not, and any such assignment shall pass and convey the estate of the assignor in the mortgage premises, and the assignee may sue thereon in his own name, but, in any such action by the assignee, there shall be allowed all just setoffs and other defenses against the assignor that would have been allowed in any action brought by the assignor and existing before notice of such assignment.
The trial judge relied on Mellon Bank, N.A. v. Vienor Ltd. Corp., 245 N.J. Super. 413, 416, 585 A.2d 985 (Ch.Div. 1990), which held that the foregoing statute allows a mortgagor to assert personal defenses against an assignee of a holder in due course of a negotiable mortgage note accompanied by a mortgage. Mellon Bank was wrongly decided.
N.J.S.A. 46:9-9 was enacted in 1863 by L. 1863, c. CXL, p. 267. One of the purposes of N.J.S.A. 46:9-9 was to permit the assignment of mortgages while at the same time reserving for the mortgagor all of the claims and defenses the mortgagor had against the assignor. The Code also recognizes the importance of the right to transfer negotiable instruments. N.J.S.A. 12A:3-201(1). But the maker of a negotiable instrument, unlike a mortgagor, can only assert the claims and defenses against transferees who have been parties to any fraud or illegality affecting the instrument or transferees who were prior holders with notice of the defenses or claims and not against holders in due course. Why is it then, that when the Code was enacted in New Jersey a full century after N.J.S.A. 46:9-9 had been in effect, and at a time when mortgages were widely used as security for payment of a negotiable instrument, the apparent conflict was not resolved by the Legislature? We believe the answer is to be found in Magie v. Reynolds, 51 N.J. Eq. 113, 26 A. 150 (Ch.Div. 1893).
*44 Approximately thirty years after N.J.S.A. 46:9-9 was enacted, Magie, supra, was decided. There the Vice Chancellor acknowledged that by 1893 it was a settled rule in New Jersey that an assignee of a bond and mortgage takes them subject to all equitable defenses which the mortgagor may assert. The court stated that:
[I]f the mortgage is given to secure a negotiable promissory note, and the note is negotiated for value in the ordinary way before maturity, the holder will hold it and the mortgage free from all defences. But if the mortgage be given to secure a non-negotiable instrument, the assignee takes it subject to all defences to the bond or other instrument manifesting the indebtedness. [Id. at 117, 26 A. 150 (citation omitted)].
Although the above quote was dictum in Magie, we believe it represents an accurate statement of the law. See also Atwater v. Underhill, 22 N.J. Eq. 599 (E. & A. 1872); Kamena v. Huelbig, 23 N.J. Eq. 78 (Ch. 1872). Our research does not convince us that in 1863 mortgage debts were embodied in negotiable instruments to any appreciable degree.
We note that Magie, supra, did not refer to the 1863 law and the Negotiable Instruments Law was not enacted until 1902 by L. 1902, c. 184, later repealed by the Code. We are persuaded the reason that the 1863 law was not considered is because N.J.S.A. 46:9-9 was always intended to be limited to non-negotiable instruments, such as a mortgage bond, rather than negotiable instruments, such as a promissory note. A mortgage bond is not a negotiable instrument under N.J.S.A. 12A:3-104(2). This is the precise interpretation of N.J.S.A. 46:9-9 by Assembly Bill No. 215, pre-filed for introduction in the 1992 Legislative Session. It creates an exception to the statute by providing that:
[W]hen the underlying mortgage is evidenced by an instrument meeting the criteria for negotiability set forth in N.J.S. 12A:3-104, the holder of the instrument shall be a holder in due course and shall be afforded all the rights and protections provided a holder in due course pursuant to N.J.S. 12A:3-302. [Ibid.]
Further support for our conclusion is found in 29 N.J. Practice, Law of Mortgages, § 124, at 567-568 (Roger A. Cunningham & Saul Tischler) (1st ed. 1975). There it is observed:

*45 When a mortgage secures a negotiable instrument, the great weight of authority in other jurisdictions is that a transfer of the negotiable instrument to a holder in due course to whom the mortgage is also assigned will enable the assignee to enforce the mortgage (as well as the negotiable instrument) according to its terms, free and clear of any personal defenses the mortgagor may have against the assignor. This results from the view that the mortgage is mere "incident" or "accessory" to the debt and when the debt is embodied in a negotiable instrument the quality of negotiability is necessarily imparted to the accompanying mortgage. [Ibid. (footnote omitted)].
Furthermore, the supplement states:
The 199[0] Chancery Division decision [Mellon Bank] is clearly unfortunate. The decision appears to be unsound on both statutory construction and policy grounds. N.J.S.A. 46:9-9 should be construed as applicable only to mortgages securing non-negotiable instruments because, at the time the statute was originally enacted  and, indeed, until quite recently  non-negotiable bonds were almost invariably used to embody mortgage debts. The legislature can hardly be deemed to have intended the statute to apply to mortgages securing negotiable instruments. And it seems clear that the policy underlying the "holder in due course" rule should, as a matter of policy, apply to such mortgages, in view of the frequency with which such mortgages are transferred by the originator to a financial institution which "packages" large numbers of mortgages for resale to investors. To require either the "packager" or the ultimate investor-purchaser to determine in advance of purchase whether the mortgagee has any defense against enforcement of the mortgage would be absurd. Hopefully, either the New Jersey Supreme Court or the New Jersey Legislature will clarify the law by making it clear that the "holder in due course" rule does apply to mortgages securing negotiable instruments. [Id. at 90 (West Supp. 1991) (footnotes omitted)].
It would be incongruous to interpret an 1863 legislative enactment to defeat one of the more significant benefits of modern commercial law, which is to achieve the status of a holder in due course. See N.J.S.A. 2A:3-305. The drafters of the Code have expressly recognized the desirability of using negotiable instruments in conjunction with commercial mortgages. N.J.S.A. 12A:3-105(1)(e) provides that a promise or order that is otherwise unconditional, is not made conditional by the fact that the negotiable instrument "states that it is secured, whether by mortgage, reservation of title or otherwise." The impact of Mellon Bank is to invalidate N.J.S.A. 12A:3-305 and N.J.S.A. 12A:3-105(e)(1) in the commercial mortgage market in New Jersey. The effect of Assembly Bill No. 215, is to overturn Mellon Bank. We overrule Mellon Bank.
*46 In summary, we hold that plaintiff is a holder in due course of the Shalleck note and that N.J.S.A. 46:9-9 applies only to mortgages given to secure a debt embodied in a non-negotiable instrument such as a bond. We reverse the judgment of the trial court finding plaintiff is not a holder in due course as well as the finding that N.J.S.A. 46:9-9 applies to this case. The matter is remanded to the Chancery Division for further proceedings respecting the Shalleck note and mortgage. We do not retain jurisdiction.
Reversed and remanded.[2] The cross-appeal is dismissed.
NOTES
[1] We are aware of 21 states which have amended their statutes to adopt changes consistent with the new revision. Az.Rev.Stat.Ann. § 47-3106 (1988); Ark. Code Ann. § 4-3-112 (1991); Cal.Com.Code § 3106 (effective October 2, 1989); Haw. Rev. Stat. § 490:3-112 (1991); Ind. Code § 26-1-3-106 (effective July 1, 1990); Iowa Code § 554.3106 (1988); Kan. Stat. Ann. § 84-3-112 (1992) Ky. Rev. Stat. Ann. § 355.3-106 (effective July 13, 1990); La. Rev. Stat. Ann. § 10:3-106 (1988); Md.Com.Law I Code Ann. § 3-106 (effective July 1, 1990); Miss. Code Ann. § 75-3-106 (effective April 15, 1988); Mo. Rev. Stat. § 400.3-106 (1988); Nev.Rev.Stat. § 104.3106 (1989); N.D. Cent. Code § 41-03-06 (1989); N.Y.U.C.C.Law § 3-106 (effective July 8, 1988); Okla. Stat. tit. 12A § 3-112 (1991); Or. Rev. Stat.Ann. § 73.1060 (1989); Tenn. Code Ann. § 47-3-106 (1981); Va. Code Ann. § 8.3-106 (1988); Wash. Rev. Code § 62A.3-106 (1989); W. Va. Code § 46-3-106 (1989).
[2] Four additional states have made changes to their Codes to permit the use of variable interest rates without affecting negotiability: Florida, Illinois, Montana and Nebraska. These changes were made in late 1991 or in 1992, and we were unable to obtain pinpoint citations prior to filing this opinion.